Swift et al. v. Castle.

RICHARD K. SWIFT *et al.*, Plaintiffs in Error, *v.* EMELINE CASTLE, Defendant in Error.

ERROR TO GRUNDY.

A chancellor should only consider such evidence as is material, and legal, in rendering a decree; and exceptions, as to the pertinency of evidence, are heard on the final argument.

Formal exceptions to depositions, etc., should be taken and determined before the hearing.

A bill of exceptions in equity need not recite the rulings of the chancellor, which in contemplation of law, make a part of the record; but should introduce into the record that which would not otherwise make a part of it.

A married woman can only convey her trust property, (as a marriage settlement,) in the manner authorized and for the purposes specified in the deed creating the trust. Creditors of the husband must take notice of the existence and conditions of the trust.

A marriage settlement is to have the same effect and construction, whether made by the wife before marriage, or by a third person. (CATON, C. J.)

Where a particular mode of appointment, or object, in a deed of trust, is specified, and negative words are used, relating to the appointment or object, the negative words become commandatory. (CATON, C. J.)

The deed of a married woman may be set aside, if extraordinary and wicked means are resorted to, for the purpose of coercing an acknowledgment of its execution. (CATON, C. J.)

THIS was a bill in chancery filed in the Circuit Court, by Emeline Castle, by her next friend, against plaintiff in error and others.

The bill charges that complainant was married on the 14th day of November, 1848, to Edward H. Castle, (one of the defendants below.) That on the day before the marriage, and in contemplation thereof, there was executed between complainant and said Edward H. Castle, and one Whitlock, a deed, reciting that marriage was contemplated, and that complainant, (then Emeline Bennett,) was possessed of certain real and personal estate, (set out in the deed,) embracing a farm of about two hundred acres; the farming utensils and grain thereon; the stock thereon, consisting of horses, cattle, hogs, etc., and the household goods and silver ware in the house on the farm, all of which she was minded to convey to Whitlock, " in trust for her own use and benefit."

And " in consideration of the premises, and of one dollar," giving, granting, selling and conveying the said estate, real and personal, by said Emeline, to said Whitlock—

" To have and to hold, said real and personal estate, to said Whitlock forever; but upon the special trusts, and for the uses and purposes, and subject to the powers and obligations following, and none other, namely :

14

"First. That until the solemnization of the said intended marriage, the said trustee shall hold the said estate and property to and for the sole use of the said Emeline Bennett, and shall pay over to her, or empower her to receive for her own use, all the rents, income, and profits arising from, or out of said trust estate.

"Second. That from and after the solemnization of the said intended marriage, the said trustee shall collect and receive the rents, income, and dividends of the said trust estates, and moneys, or any estates or property which may be substituted therefor, as is hereinafter provided, so often and whenever the same may be due and payable, and after the deduction of all incidental expenses, shall pay over the same to the said Emeline Bennett upon her sole and separate receipt, and free from the control or interference of any person whomsoever, during her coverture with the party of the third part.

"Thirdly. That the said trustee shall have power, with the approbation or at the request of the said Emeline Bennett, expressed in writing, to sell and dispose of the said trust estate, or any part of it, and the proceeds to invest in other personal or in real estate, or deliver the same over to the said party of the first part, according to the written directions of the said Emeline Bennett. And the estate so purchased shall be had and held by the trustee for the same uses and purposes, and upon the same trusts as are declared in and by this indenture of and concerning the property and estate first above mentioned, and may be sold, and the proceeds re-invested from time to time in trust in manner aforesaid; and it is hereby declared that the purchaser of any estate held in trust as aforesaid, shall not be bound to see to the application of the said purchase money.

"Fourthly. That in the event of the decease of the said party of the third part, living the said Emeline Bennett, all the estates and property then held in trust under this indenture, shall be conveyed and transferred back to the said Emeline Bennett, and the trustee shall forthwith execute and deliver all such deeds and instruments as shall be needful and proper for that purpose.

"Fifthly. That in case of the decease of the party of the second part, or of his resignation of the said trust, he, or his executors or administrators, shall convey, transfer, and pay over the whole of the trust estate then held by him, to such person as may be appointed in writing by the said party of the first part, to be the trustee under this indenture. And such new trustee shall have all the powers, and shall hold the trust estate subject to all the provisions herein set forth and expressed. And the receipt of such new trustee for the trust property shall be a

Swift et al. *v.* Castle.

complete acquittance and discharge to the said party of the second part, his executors and administrators; and in like manner other new trustees may be appointed from time to time as occasion may require.

"And the said Edward H. Castle doth for himself, his heirs, executors, administrators and assigns, covenant and agree to and with the said Thomas Whitlock, in manner following, that is to say: that if the said intended marriage shall take effect, he, the said Edward H. Castle, shall and will permit and suffer the said Emeline Bennett to give, grant, and dispose of her said separate estate as she shall think fit in her lifetime, and to make such will, or other writing as aforesaid, and thereby to give, order, devise, limit, and appoint her said separate estate to any person or persons, for any trust, use, intent or purpose whatsoever; and that the person or persons to whom the said Emeline Bennett shall give or dispose any part of her said separate estate by her will, or any other writing that shall be signed, sealed and executed by her in the presence of two or more credible witnesses as aforesaid, shall, and lawfully may, peaceably and quietly have, hold, use, occupy, possess, and enjoy the same, according to the true meaning of such gift and devise or appointment, without any denial, hindrance, or interruption of, or by the said Edward H. Castle, his executors, administrators, or assigns, or any of them.

"And the said party of the second part doth hereby signify his acceptance of the said trust, and doth engage to hold and manage the same upon the trusts, and for the uses herein mentioned.

"And the said party of the third part doth hereby signify his assent to the provisions of this indenture, and doth covenant to and with the party of the second part, and his successors in the said trust, to permit the said party of the first part, after the solemnization of the said intended marriage, to receive the aforesaid income and profits to her sole and separate use, and not to interfere with the said trust estate otherwise than in conformity to the provisions of this indenture.

"In witness whereof, the said parties have hereunto set their hands and seals, the day and year above written.

EMELINE BENNETT. [L. S.]
THOMAS WHITLOCK. [L. S.]
EDWARD H. CASTLE. [L. S.]

"Signed, sealed and delivered in presence of

L. C. KERCHEVAL,
GEO. W. LAY, JR."

The bill further shows, that in the year 1856, the trustee

Whitlock was removed by order of the Cook County Court of Common Pleas, and Joseph Filkins was appointed trustee in his stead, and all the separate estate of Mrs. Castle, so held in trust for her by Whitlock, was conveyed to Filkins, to be held by him upon the same trusts for the same purposes and uses, and subject to the same powers named in the antenuptial deed to Whitlock.

That afterwards, Filkins, as such trustee, out of the proceeds of said trust property, bought two parcels of real estate, called in the bill "The Holstein property" and "The Park Avenue property," a particular description of which is set out in the bill, and held the same subject to the trusts, uses, powers and limitations in the antenuptial deed, as the separate estate of Mrs. Castle, the complainant.

That on or about the 3rd of May, 1856, Filkins, complainant and her husband, E. H. Castle, by two deeds of trust, conveyed the Holstein property and the Park Avenue property to R. K. Swift, to secure the payment of divers promissory notes of that date given by her husband, E. H. Castle, to divers of the other defendants to the bill, amounting in all to about the sum of $14,000, to be paid at six months from date, with a power of sale in default of payment.

It is sought by the bill to set aside these two deeds of trust to Swift, and declare the same void as against the complainant, (Mrs. C.), and for an injunction, etc. ; and this was claimed by complainant upon three distinct grounds :

1st.  That the trust deeds to Swift were unwarranted by powers contained in the antenuptial deed, and Filkins, the trustee, had no authority to execute them, inasmuch as the sale was not made for the purpose of "*re-investing* the proceeds in other property," to be held *upon like trusts* for the separate use of complainant, nor for the purpose of "*delivering* over the proceeds of the sale *to her*."

2nd.  That the said deeds to Swift were made as an inducement to suppress a criminal prosecution ; and

3rd.  That the complainant was induced to execute the deeds on her part by undue and improper influences, for which they ought to be set aside.

It was alleged that a few weeks before the execution of said deeds, two criminal prosecutions were instituted before a justice of the peace (by certain creditors of one Edmund S. Castle) against the husband of complainant, and against her trustee, Filkins, and others, charging them with fraud and a conspiracy to give said Edmund S. Castle a false credit, by which said creditors were induced to sell him goods on time, and their claims had proven worthless ; that said prosecutions were postponed

from time to time till after the making of said deeds; that inflammatory articles were published from day to day in the daily papers of the city, pending said prosecutions; that these papers were read by complainant; that her husband became greatly excited and alarmed, and induced her to believe, and she did believe that he was in danger of being sent to the penitentiary; that these prosecutions were instituted by said creditors for the mere purpose of compelling Edward H. Castle, the husband of complainant, by intimidation to secure and pay their demands against Edmund S. Castle; that pending these prosecutions it was agreed by Edward H. Castle and certain of the creditors, who were actively pushing on these prosecutions, that Castle, the husband of complainant, should liquidate the demands against E. S. Castle by giving the notes mentioned in said trust deeds, and should cause them to be secured by a deed of trust on his wife's property aforesaid, and that upon that being done, the prosecutions should be abandoned; that in pursuance of that agreement, said Castle, the husband, besought his wife to join in making the deeds of trust, which she at first declined; that at the time the complainant was in feeble health— was pregnant—and that her husband was greatly alarmed and excited by his embarrassment, so much so as to beget fears as to his sanity, and that he might commit suicide; that her husband besought her with great violence and importunity to rescue him by consenting to the deeds of trust, and that he threatened her with abandonment if she did not comply, and that by such causes she was induced to sign the deeds, and did so, and that the deeds were made in pursuance of the agreement aforesaid; that the prosecutions were in that case to be abandoned, and that after the deeds were made, the prosecutions were accordingly abandoned.

The bill and the proofs are full of details, which need not be stated.

Much of the evidence in connection with the means used to induce Mrs. Castle to execute the papers will be found in the second dissenting opinion of Mr. Justice BREESE.

The answers admit the making of the antenuptial deed; admit the marriage; the removal of Whitlock and the appointment of Filkins, and the purchase of the property in question by Filkins avowedly under the trust of the marriage settlement, and the making of the notes by E. H. Castle, and the making of the deeds of trust; admit the fact of the prosecutions, and that they were no further prosecuted, but they deny that the prosecutions had anything to do with the giving of the notes and deeds of trusts in question, and set up that the property named in the antenuptial deed was not the property of com-

plainant, but was that of E. H. Castle, and was thus covered fraudulently to hinder his creditors, and that the property in the deeds of trust sought to be set aside, was, in fact, bought with the means of E. H. Castle, and not with the proceeds of his wife's alleged separate estate, etc. Replications were filed, and the proofs were very voluminous. The substance of the proof is referred to in the opinions of the judges, and need not be stated here.

The Circuit Court declared the deeds to Swift void, and the creditors bring the case to this court to be reviewed.

W. T. BURGESS, and H. F. WAITE, for Plaintiffs in Error.

T. L. DICKEY, for Defendant in Error.

WALKER, J. It is urged as error, that the court below admitted improper evidence. It may be true that evidence was read on the hearing that was not pertinent to the issue, and yet there be no error for which the decree should be reversed. The question presented upon the trial before the chancellor, as well as in the appellate court, is, upon all the legitimate evidence in the cause, what decree should be rendered. The chancellor being the judge of both the law and evidence, the presumption is, that in rendering his decree he will only regard that which is legal and pertinent. When a trial is had before a jury, it is different, as then the court must first pass upon the admissibility of the evidence, and when admitted, the presumption is that they acted upon and considered all of the evidence before them as legitimate. When the party conceives that there is any irregularity or informality in taking the proofs, he may move to suppress depositions, and if the exceptions are overruled, he may except, but all questions as to the pertinency of evidence may be, and usually are, reserved to the hearing. All substantial exceptions may be taken on the hearing, either before or after the evidence is read, and the chancellor may determine such exceptions as they are raised, or in forming his judgment upon which he bases his decree in the cause. Formal exceptions should be taken and determined before the hearing, for the reason that, if allowed, the party taking the depositions may, if proper, retake them, and avail himself of the benefit of the evidence. While it is not material when exceptions to the substance of evidence are determined, for if the evidence is not admissible under the issue, its presentation in any other form could not obviate the objection, and render it pertinent. Such a practice is more convenient than to separately pass upon the materiality of the various portions of evidence before the hearing; it saves labor, time and expense, and is more satisfactorily

determined when the issue, and all the evidence in the case, are before the court, on the hearing, than it could be when only an isolated portion is under consideration.

Evidence may be proper for one purpose and improper for another. It may be admissible as independent evidence, or only as dependent evidence. It may be admissible as tending to establish the issue, or it may be admissible as rebutting or supporting evidence. It may prove a fact, or it may only be a link in a chain which proves a fact. And if the court must, on a motion interposed before the hearing to suppress evidence, examine into all of the facts proved in the case to determine its materiality, it would amount to the labor of a trial of the cause on each motion, and if all the evidence was not then taken, the chancellor, in many cases, could not know but evidence might still be taken which would render what then appeared to be immaterial, highly important on the hearing. It is the correct practice for the chancellor, after the evidence is heard, to regard no portion of it which is immaterial or illegal, and to decide the case alone on the legal evidence adduced. Such is believed to have been the uniform practice which has been adopted from considerations of convenience, and is in no way calculated to hinder or delay the administration of justice, and no reason has been suggested, nor is any perceived, why it should be changed. Nor is it necessary to preserve exceptions to the rulings of the court in allowing or overruling exceptions to answers, depositions, or decrees, in a chancery proceeding, as in contemplation of law, all the decisions on motions, all of the evidence in the cause, and the decrees announced by the court, are matters of record. The office of a bill of exceptions is to introduce that into the record which, without its use, would not be a part of the record.

It is urged as a ground for setting aside the trust deeds executed to Swift by the trustee, the *cestui que trust* and her husband, that they were unauthorized, and were not legally binding upon the *cestui que trust.* The question of whether a *feme covert cestui que trust* may dispose of her beneficial interest in the trust property by appointment, in all cases where she is not in terms restrained from doing so by the instrument creating the trust, has undergone much discussion by the various courts of this country and Great Britain. And upon an examination of the adjudged cases, they are found to be inharmonious and conflicting. One portion of them holding that a *feme covert* may exercise all the powers of a *feme sole* in alienating her separate property, unless restrained by the express language of the instrument creating the trust. While another, and much the larger class, hold that by her marriage she loses all power

to contract in her own right, and that she and the husband, by that relation, become one person in law, and that her legal existence is merged in his, so long as coverture exists, and that she can perform no legal or binding act, in reference to her separate property, but such as is authorized by the instrument creating the trust.

In determining this question, in the conflict of adjudged cases, it may be well to review some of the decisions of the various courts in which this question has been presented and judicially determined. In the case of the *M. E. Church* v. *Jaques*, 3 J. C. R. 77, Chancellor Kent, before whom the case was heard, with his usual industry and accuracy, with great learning and ability, after having carefully reviewed all the English decisions at great length, in delivering his opinion, says :

" I apprehend we may conclude, (though I do it with unfeigned diffidence, considering how great talents and learning, by a succession of distinguished men, have been exhausted on the subject,) that the English decisions are so floating and contradictory, as to leave us the liberty of adopting the true principle of these settlements. Instead of holding that the wife is a *feme sole*, to all intents and purposes, as to her separate property, she ought only to be deemed a *feme sole, sub modo*, or to the extent of the power clearly given by the settlement. Instead of maintaining that she has an absolute power of disposition, unless specially sustained by the instrument, the converse of the proposition would be more correct, that she has no power but what is specially given, and to be exercised only in the mode prescribed, if any there be. Her incapacity is general ; and the exception is to be taken strictly, and to be shown in every case, because it is against the general policy and immemorial doctrine of the law. These very settlements are intended to protect her weakness against her husband's power, and her maintenance against his dissipation. It is a protection which this court allows her to assume, or her friends to give, and it ought not to be rendered illusory."

" The doctrine runs through all the cases, that the intention of the settlement is to govern, and that it must be collected from the terms of the instrument. When it says, she may appoint by will, it does not mean that she may likewise appoint by deed ; when it permits her to appoint by deed, it cannot mean, that giving a bond, or note, or parol promise, without reference to the property, or making a parol gift, is such an appointment. So, when it says that she is to receive from her trustee the income of her property, as it, from time to time, may grow due, it does not mean that she may, by anticipation, dispose at once of all that income. Such a latitude of

construction is not only unauthorized by the terms, but it defeats the policy of the settlement, by withdrawing from the wife the protection it. intended to give her. Perhaps we may say, that if the instrument be silent as to the mode of exercising the power of appointment or disposition, it intended to leave it at large, to the discretion and necessities of the wife ; and this is the most that can be inferred."

This was a case, in many of its features, similar to the one under consideration, and in which this point was presented for decision. It is true that this decision was reversed by the Court of Errors ; but that being a court composed of judges and the members of the Senate, many of whom were not members of the legal profession, it does not militate against the reasoning of the chancellor.

In the case of *Ewing* v. *Smith*, 3 Dessaussure S. C. R. 417, the court, Watirs, J. delivering the opinion, after having partly reviewed the English decisions, says : " I think, therefore, it may be fairly said, that the ground of authority is taken away from any precedents by which this court can be bound. But if it were not so, and if those relied on for complainant had their full weight, I should think, even on the ground of construction, that the power of Mrs. Smith over her separate estate was restricted to an appointment by will, and that she could not charge it with debts. It is admitted in the strongest of these cases, that when the power of disposing is exclusively restricted to a particular mode, it cannot be exercised by any other. It is true that there is no express restriction in this case, but such an intention appears to me from the nature of the settlement. * * * * * * Here, then, we see the English chancellors, although differing as to the obedience which they owed to precedent, yet all uniting in condemning the absolute dominion given to married women over their estates, and all concurring in recognizing and declaring what ought to be principles. I may, therefore, confidently say that even if Lord Thurlow and Lord Eldon were now sitting on this bench, and called on to settle the law for this community, they would settle it on these principles. Instead then of opposing their high authority, I feel expressly authorized by them in declaring the opinion ; that a married woman, who has a separate estate, cannot part with it, or charge it, in any way, *without an examination ;* that as by marriage she loses all the powers of a *feme sole*, a separate estate does not confer all those powers on her, and that, therefore, the power of appointing such estate must be expressly given, and the mode prescribed be strictly pursued. As the bond given by Mrs. Smith has not these sanctions, I am of the opinion that it ought not to be enforced."

Again, in *Calhoun* v. *Calhoun*, 2 Strob. 234, and in *Reid* v. *Lamar*, 5 Strob. 37, the same court fully recognized the principles laid down in *Ewing* v. *Smith*, as the settled law. In the case of 5 Strob., the court says: "If anything can be considered as settled, it is the settled law of this State, that where property is given, or settled, to the separate use of a married woman, she has no power to charge, encumber or dispose of it, unless in so far as power to do so has been conferred upon her by the instrument creating her estate, which power must be strictly pursued."

In the case of *Weeks* v. *Sago*, 9 Georgia, R. 199, the court recognize the rule that when the marriage settlement prescribes a particular mode for the disposition of the separate estate of a married woman, she cannot dispose of it in any other, as when the power of disposing of it by will, with the consent and approval of her trustee, that she cannot dispose of it by will without the consent and approbation of such trustee. And that court, in the case of *Wyllett* v. *Collins*, 9 Georgia, 237, says, "This court has not felt at liberty to depart from the doctrine held by Chancellor Kent, in the case of the *M. E. Church* v. *Jaques*, (3 J. C. R. 77,) that a *feme covert* with respect to her separate property, is to be considered as a *feme sole*, to the extent only of the power given her by the deed of settlement." The same rule was recognized in the subsequent case of *Fears* v. *Brooks*, 12 Georgia, 200, and later decisions, and it may be considered the settled law of that State. The Supreme Court of Texas also recognize and adopt the doctrine of the South Carolina courts. In the case of *Cartright* v. *Hollis*, 5 Texas, 169, the court say, "The rule established by the South Carolina decisions appears to be more safe, and is more likely to promote the objects of the grant of a separate estate, than the English doctrine, which gives a married woman the power of a *feme sole* over her separate estate."

The Supreme Court of Maryland, in the case of *Miller et al.* v. *Williamson et al.*, 5 Md. R. 219, say, "From this review of the decisions of our State, it appears it never has been decided that the wife has the right to dispose of her separate estate unless that power be given to her by the instrument making the settlement, nor where such power is exercised in a manner different from that pointed out in the deed or will, as the case may be; so far from it, it was expressly said in the case of *Tiernan* v. *Poor*, that the right of disposition contained in the deed constitutes a permanent law, and that no decree could pass to enforce any contract unless such contract be within the limits of her *jus disponandi*." In subsequent cases, the same court has held that a married woman has no power over her separate property, but

such as is specially conferred by the instrument creating the estate, and in its disposition she is restrained to the particular mode specified in the instrument when it undertakes to make such a specification. This, we think, may be regarded as the settled rule in that State.

The Supreme Court of North Carolina, in the case of *Newlan* v. *Freeman,* 4 Iredell Eq. R. 312, hold that, when land is conveyed to a *feme covert,* or to a trustee, for her separate use, she has no power of disposing of it by will, nor otherwise than by the mode prescribed for the conveyance of land by married women, unless a power to that effect has been expressly given to her in the deed of conveyance.

The Supreme Court of Mississippi, in the case of *Doty* v. *Mitchell,* 9 Smedes & Marsh. 447, holds that, "A married woman, as to her separate estate, is a *feme sole* only so far as the instrument conferring the separate estate creates her a *feme sole.* And in the disposition of such estate, the married woman is restricted to the particular mode or manner pointed out by the nstrument conferring the estate."

The Court of Appeals in Virginia, in the case of *Williamson* v. *Burkman,* 8 Leigh, 27, Judge Tucker delivering the opinion, says, " Upon the best reflection which I can give this matter, I am of opinion that a *feme covert* holding separate property in real estate by deed or will prescribing a particular mode of disposition, cannot dispose of it in any other mode, although the deed or will does not negative such other mode expressly."

The Supreme Court of Pennsylvania, in the case of *Lancaster* v. *Dolan,* 1 Rawle, 248, C. J. Gibson delivering the opinion, says, " In fine, notwithstanding the case of *Newlan* v. *Newlan,* (1 Serg. & Raw. 275,) which was hastily determined, on an exception to evidence, we are entirely prepared to adopt the conclusions of Chancellor Kent in the *M. E. Church* v. *Jaques;* that the English decisions are so floating and contradictory, as to leave us at liberty to adopt the true principle of these settlements. That instead of holding the wife to be a *feme sole* to all intents, as regards her separate estate, she ought to be deemed so only to the extent of the power clearly given by the conveyance. * * * That she has no power but what is absolutely given." And in the subsequent case of *Thomas* v. *Falwell,* 2 Wharton, 16, Chief Justice Gibson, in delivering the opinion of the court, says, " We adhere to *Lancaster* v. *Dolan,* as an authority unopposed to any other, to which we are bound to submit, and as a decision founded in convenience and reason." Again the court say, " Why is a settlement ever made ? certainly to exclude a husband's control. But to exclude his direct control, which consists of an exercise of legal power, and yet leave him the

means of giving effect to an indirect control, which consists in an exercise of personal influence, is to do nothing." * * * * And, in conclusion, he says, " We, therefore, hold it to be the settled law of Pennsylvania, that instead of having every power from which she is not negatively debarred in the conveyance, she should be deemed to have none but what is positively given or reserved to her."

In Tennessee, the Supreme Court, in the case of *Morgan* v. *Elam*, 4 Yerger, 450, the court say, Ch. J. Catron delivering the opinion, " What the English doctrine is on this subject, it is difficult to ascertain. The decisions are so confused and repugnant, that Lord Eldon's complaint (8 Ves.) is most true. He says, " Upon all these cases together, it is utterly impossible to know the result."

" There are two classes of cases which lay down different rules. The one, that a married woman with separate property has no power over it, but that which is conferred upon her by the settlement. * * * The other class lays down the rule that a *feme covert* with separate property is to all intents a *feme sole*, except in so far as she is restricted by the instrument under which she claims."

" I find the reported cases of little use, and calculated rather to disturb than confirm a well settled principle of common law, that a married woman has no property or powers ; but equity permits her to be exempt from this rule so far as she stipulates for exemption."

" Yet the court can give her no powers beyond those given by the settlement. She acts substantially as an attorney in fact in such case, as she well may in any other. In either case she must pursue the express authority—all beyond it is void." And the same doctrine is fully recognized by subsequent adjudications of that court.

The Supreme Court of the United States lays down the same rule in the case of *English* v. *Foxall*, 2 Pet. R. 595. The court there say : " What then is to be understood by the stipulation, that the investment was to be made *with* her approbation ? That she was to have some agency in this investment, cannot be questioned. And it is an unreasonable interpretation to say that she was to have a controling agency within the limitation prescribed by the contract. She has not an arbitrary and unlimited discretion. The investment is restricted to these objects : freehold securities, United States stock, or bank stock, and the trustees are not authorized to make any other investment. Nor can she approve or disapprove of any others. All such acts, both in them and her, would be without authority."

On the other hand, it is urged that the current of the English

decisions support the rule, that the *feme covert* is in equity regarded as a *feme sole*, and has the absolute control and disposition of her separate property, unless expressly restrained by the instrument by which her right to its use is created. We have seen that Chancellor Kent, Chief Justice Gibson, Judge Catron, and the Supreme Court of South Carolina, as well as the various other courts referred to above, arrive at a different conclusion. They hold that the English decisions do not establish the rule. It is true that those in its support are more numerous than those which are opposed to it. Lord Eldon and Lord Thurlow both regarded the rule as thus settled, but gave effect to it with great reluctance, and clearly intimated, that if it had not been that they felt themselves bound by former adjudications, they would have held the other way upon principle. And others following the rule, have done so with regret. The dissent of such names as those of Thurlow and Eldon certainly goes far to impair the force of the English decisions which support this doctrine. And the decisions referred to above hold a different rule from the English cases. The case of *Jaques* v. *M. E. Church*, 17 J. R. 548, reversing the decree rendered by Chancellor Kent in the same case, is in support of the rule contended for by plaintiffs in error. The court say, Platt, J. delivering the opinion : " We must set out in the argument with the consideration that she alone was absolute owner of all the property, and had a perfect right to dispose of it as she pleased. And the question then is, how far, if at all, did she divest herself of the estate, or of her disposing power over it by the settlement ? In my judgment, it would require plain and express words to authorize the conclusion, that she meant to lock up her property, or to tie her own hands in the use of it, or to restrict herself in the mode of disposing of it. The specification that she might dispose of it *by deed* or *by will* is no necessary implication that she might not do it in any other mode common to every proprietor."

And this doctrine is supported by the subsequent decisions of the court, and there seems to be no doubt that it is the settled law in New York.

The Court of Appeals in Virginia, in the case of *Vironneau* v. *Pegram*, 2 Leigh, 183, say, the wife " has the right to dispose of all her separate personal property and the profits of her separate real estate as a *feme sole*, unless restrained by the instrument creating the separate estate." The will gave appellant an estate to her separate use and benefit, and imposed no restraint on her power of alienation. This was in the case of a devise to the wife, so that the husband might have no control over or right to the same. It will be observed in this case that

no specific mode of appointment or disposition of the fund is prescribed by the will, and it is also in relation to personal property, and is therefore not repugnant to the case of *Williamson* v. *Burkman*, 8 Leigh, 27, which related to real estate, and even if it was, the latter case is subsequent in point of time, and overrules the former.

Judge Story, in his Commentaries on Equity Jurisprudence, Vol. 2, Sec. 1390, lays it down as a general rule, " that all antenuptial agreements for securing to a wife separate property, will, unless the contrary is stipulated or implied, give her in equity full power of disposing of the same, whether real or personal, by any suitable act or instrument in her lifetime, or by her last will, in the same manner and to the same extent as if she were a *feme sole*. And in all cases where this power is reserved to her by means of a trust which is created for the purpose, she may execute the power without joining her trustees, unless made necessary by the instrument of trust."

The Court of Appeals in Kentucky, in the case of *Hancock* v. *Ship*, 1 J. J. Marsh. 438, hold that where slaves were held in trust for the husband and wife, and they, with the consent of the trustee, sold them, that if the trust had been for the separate use of the wife, she alone was competent to dispose of it, and the trust being for their joint use, they might sell the property to another.

Appellant refers to the cases of *Brundridge* v. *Poor*, 2 Gill & J. R. 1, and *Tiernan* v. *Poor*, 1 Gill & J. R. 216, in support of the rule, but it will be observed that in the first of these cases, the property was conveyed to trustees for the wife's sole use, to dispose of at her pleasure without control of her present or future husband, and in the latter there was a conveyance to the wife, with power to sell, convey and dispose of, absolutely subject to no control whatever. In these cases ample power was given by the conveyance to dispose of the property, and the mode of its disposition was not controlled or pointed out by the instruments creating the estate. And therefore they do not conflict with the later decisions in that court, but rather support them. And if there was any doubt on this question, it is determined by the case of *Miller* v. *Williamson*, which is later in point of time, and must have been considered by the court in this last adjudication.

From these various cases it is manifest to our minds, that the weight of authority clearly is, that a married woman can only convey her trust property in the manner authorized, and for the purposes specified, in the instrument creating the trust, if it contain any such provisions, otherwise she may dispose of it, without restraint either as to manner or purpose. It is true

that Judge Story seems to aim at a different conclusion, unless he is to be understood, that when the manner and object of its disposition is pointed out, that it amounts to a stipulated or implied prohibition, that no other mode can be resorted to.

At the common law, by marriage the wife loses, during its continuance, all legal capacity to contract, or to sue and be sued, in her own right, and during the continuance of that relation, her legal existence is almost entirely suspended. She could sell her real estate or bar her right of dower, only by uniting with her husband in suffering a fine. She could not hold separate property in her own right, and her personal property held at the time of the marriage, as well as her future acquisitions, vested absolutely in her husband, also the use of her real estate. But by the interposition of a trustee, in whom the legal title is vested, by the instrument creating the trust, property may be enjoyed by her, freed from all control of her husband, and in such case she is entitled in equity to the beneficial interest. And when property is conveyed or demised to her separate use, equity gives her the power of controlling it, by sale or otherwise. And when she holds the beneficial interest, she may enjoy or sell it in the manner provided by the instrument declaring the trust. This power depends upon another well-recognized principle, that a *feme covert* may be appointed, and act as an attorney in fact. When the instrument creating the trust confers upon her power to sell or dispose of the trust estate, she, for the purposes of executing the trust, is an attorney in fact, and all her acts to be legal, must, as those of any other attorney in fact, strictly conform to the power delegated, and any deviation from its provisions will render the act void for want of authority.

No reason is perceived why a court of equity should confer upon her additional powers to those contained in the instrument creating the trust, more than it should upon any other attorney in fact. To permit her to exercise such additional powers, is only authorizing her to defeat the object of the trust, and to disregard the intention of the parties, which should control in this as in all other contracts, when it can be ascertained from the instrument. It likewise leaves her under the influence of the husband, when, in a large majority of cases, the trust is created to prevent his exercising any control over the property. But few women have the resolution to resist the influence of the husband, so as to prevent him from getting the property by her appointment, and especially so when pressed by creditors who are aware that she has the power to appropriate it to the discharge of his indebtedness. There would be constant inducements for him to resort to persuasion, coercion and other means,

to convert the property to his own use, and to withdraw the means appropriated to secure a support to herself and her children from its object. Nor is any reason perceived why a rule of construction should be departed from in this class of cases, which is applied to others, which is, that the expression of one thing is the exclusion of another. When the instrument creating the trust provides that it may be disposed of by one mode, it excludes all others, and when it provides that it or its proceeds may be appropriated to one purpose, all other purposes are thereby excluded. Then why, after declaring a particular mode or object, hold that any other mode and all other objects are embraced, unless they are prohibited by express language? It appears to us that the true rule is, that the *cestui que trust* should be restrained to the acts authorized by the declaration of the trust, and that all beyond the power thus delegated, should be held to be void. This is, we think, more consonant with legal principle, and fully comports with justice and sound policy, and is sustained by the weight of authority.

It then remains to determine whether the trust deeds in this case, executed for the benefit of Castle's creditors, when tested by these principles, were authorized by the marriage settlement. The settlement was made previous to, and in contemplation of, the marriage. It was for the settlement of the property owned by the wife, and the conclusion is irresistible that it was then the intention of the parties that the trust property should be placed beyond the control of the husband and his creditors, and also that of the wife, except for the purposes of the settlement. Otherwise there was no necessity of creating a trustee, as it would have equally required the assent of the wife to dispose of this property without as with the settlement.

The deed of settlement provides that the trustee shall collect, from time to time, the rents and profits of the trust estate, as often as, and whenever they may become due, and to pay them over to the wife on her sole-receipt, and free from the control and interference of any person whomsoever. It also authorizes the trustee to sell and convey the property, with the consent and approbation of the *cestui que trust*, expressed in writing, and to invest the proceeds in other personal, or in real estate, or deliver the same over to the *cestui que trust* according to her written directions. And that the estate so purchased, should be held by the trustee for the same uses and purposes, and upon the same trusts that are declared in the deed of settlement. The property was, by the deed, to be held by the trustee " upon the special trusts, and for the uses and purposes, and subject to the obligations therein named, and none other."

It is from these provisions, if at all, that the power to execute

these deeds of trust is obtained. They only authorize the trustee to collect the money for rents and profits, and pay it to the *cestui que trust,* on her receipt, and when she may consent, in writing, to sell all or any portion of the trust property, and to invest it in other property, or to deliver the proceeds of such sale to her, according to her written directions. And this deed limits and restricts, in express terms, the property to the special trusts, and for the uses and purposes therein named, and for no other purpose. This negative language clearly brings this case within the rule of the English courts, prohibits the disposition of the trust property, and the application of the trust fund to any other purposes than those specified in the deed. The deed of settlement, neither expressly or by implication, authorizes the property to be sold, mortgaged, or in any manner pledged, for the payment of the debts of her husband. Nor does it give her the unlimited control of the property, but gives her the power to consent to its sale, and when sold, to direct the proceeds to be invested in other property, or to be paid to her. That the design of the parties was that the fund should, in no event, be applied to any other purposes than those specified, is made, if possible, more manifest by the provision, that if the *cestui que trust* shall survive the husband, then the trustee is required to reconvey the property to her. Then, and not till then, by the deed of settlement, would she have the absolute power of disposal of the trust property. By these trust deeds, for the benefit of Castle's creditors, the objects of the trust would be defeated, as it is not done for investment, or to reduce the fund to money to be paid to Mrs. Castle, but it was to pay her husband's debts. These conveyances produced no money, to be used and applied to the objects of the settlement, nor was it intended that they should. This was prohibited by the deed, as it was not within the objects named, and all other purposes are expressly prohibited.

The powers of the trustee and the *cestui que trust* are not derived from the husband, but from the person making the settlement, and declaring the trusts. The conditions annexed to a trust, pass with the estate, and when the conveyance is made to a trustee, for the use of a married woman, she may exercise the powers granted by the deed as effectually without the consent of her husband, as with it. The covenant of the husband, in this case, that the intended wife might dispose of the trust property, by deed, or will made by her, did not enlarge her powers—they, under the settlement, were reserved by her when she executed the deed of settlement, and the power to pledge the property, in this case, was not so reserved. A fair interpretation of our statute, authorizing married women

15

to sell their real estate, by joining with their husbands in a deed of conveyance, does not authorize the sale of trust property contrary to the terms of the trust, nor does it enlarge the powers delegated to her by the instrument by which the trust is created. It may confer upon her the power of sale of trust property, conveyed or devised for her use, when the instrument by which she takes the beneficial interest in the property, is silent as to the mode of its disposition.

It is a well-recognized principle, that when the conditions of a trust deed have not been complied with, in a sale by the trustee, a court of equity will set the conveyance aside. *Taylor* v. *King*, 6 Munf. 366. Nor can the interest of the *cestui que trust* be impaired by a conveyance of the trustee to a third party for another and different trust, from those declared by the deed, under which he holds. *Shepherd* v. *McEvers*, 4 J. C. R. 136. And when the purchaser is affected with notice of the facts, which in law constitute the breach of trust, the sale is void as to him. *Wormly* v. *Wormly*, 8 Wheat. 421 ; *Mechanics' Bank of Alexandria* v. *Seaton*, 1 Pet. R. 299.

The creditors of Castle were chargeable with notice—they were dealing with a trust fund, which they knew to be such, and it was their duty to know the extent of the powers of the trustee and *cestui que trust* over it. The deed under which they claim, describes Filkins as Mrs. Castle's trustee, and this is evidence of notice that they were dealing with a trust fund, and they either knew of the terms of the trust, or should have known, and were bound to conform their acts to its terms. They had no right to give credit to the husband on the faith that the trust fund would ever be liable for its payment, and having acted in violation of the terms of the trust, and with notice, they have no right, in equity, to hold the property thus obtained.

It was also urged, that the settlement of this property upon Mrs. Castle was in fraud of creditors, as the money with which the land was entered and improved was that of her husband, and not hers. On this point, the evidence, we think, is insufficient to establish that fact. But even if it was, this settlement and the improvements were made long before these debts were incurred, and the deed of settlement was of record, and notice to the world. The indebtedness was not incurred on the faith that this property was liable for their payment, and these creditors have no right to insist upon such fraud, if it existed, to set aside the settlement. It was not made in fraud of their rights, and none but those who held debts at the time of its execution have such a right.

For these reasons we are of the opinion that these trust deeds

Swift et al. *v.* Castle.

are inoperative and void, and that complainant and her trustee are not bound by them. The decree of the Circuit Court is affirmed.

BREESE, J., dissents.                                    *Decree affirmed.*

BREESE, J. I concur in so much of the opinion delivered as establishes the practice in relation to considering substantial objections to depositions; but, much as I respect their judgment, in nothing more. I might admit that the decision of Chancellor Kent, in the case of *The Trustees of the Methodist Episcopal Church* v. *Jaques*, 3 Johns. Ch. 77, though not law even for the State in which it was made, is the best rule, and establishes the correct doctrine, and yet this case, in my judgment, would not be affected by it, nor by the other cases of a like character, to which the court has referred, as they are based on it. I say so for the reason that, in this case, the complainant, Mrs. Castle, did not attempt to do with her property, as a *feme sole*, or pursue any other mode in disposing of it, than that specified in the ante-nuptial agreement, and that such disposition was in the exercise of powers she reserved to herself when she settled her property upon herself. The whole case depends, I think, upon the construction which should be placed on this agreement. What rights and powers did Emeline Bennett, now Mrs. Castle, the complainant, reserve to herself in this settlement? Did she reserve the use of the property merely—in technical language, the *usufruct*—or the absolute *jus disponendi?*

The court seem to think she reserved only the use. I hold she retained the absolute control. This is to be determined by the agreement. In this, as in all other cases of contract, the intention of the parties to the deed must govern.

It will not be denied that this settlement of complainant was upon herself, but to act in relation to it, through the intervention of a trustee. The deed is in the record; and is between Emeline Bennett, single woman, of the first part, Thomas Whitlock of the second part, and Edward H. Castle of the third part.

Let us now examine carefully this deed. It recites that Emeline Bennett, being the owner of certain property, and about to marry E. H. Castle, is minded and disposed to transfer and convey her property to Thomas Whitlock, with the consent of her intended husband, E. H. Castle, "in trust, for her own use and benefit."

Is there any ambiguity about this language? Is not the purpose for which the conveyance is made, clearly expressed?

Whitlock consents to take the property upon the trusts declared in the deed—" to have and to hold the said real and

personal estate to the said Thomas Whitlock forever; but upon the special trusts, and for the uses and purposes, and subject to the powers and obligations following, and none other." There is no ambiguity about this language. "None other" meaning for no other use than her own use. and benefit. Whitlock takes the property, and can hold it forever, but he must regard the special trusts under which he receives it, and regard the uses and purposes to which it is limited, and be subservient to the powers retained by the grantor and bestowed upon himself, and regard the obligations he is under, and none other, as declared and specified in the deed. What are they?

The first provides, that during the time that may transpire between the making of the deed and the solemnization of the marriage between Emeline Bennett and E. H. Castle, the trustee shall hold the property for her use, and pay the rents over to her, for her sole use.

The second provides only for the rents, income and demands of the trust estate, or any estate that might be substituted therefor, as thereinafter provided, that they shall be paid over to her, upon her sole and separate receipt, free from any control; and

The third provides for the sale of the trust estate itself, on the request, or with the approbation of complainant, in writing, or any part of it, and for the disposition of the proceeds. They are to be disposed of for two purposes—either to invest in other personal or real estate, or to be " *delivered over to the said party of the first part,*" according to her *written directions.* If a sale is directed by Mrs. Castle, and the proceeds invested in other real estate, as was the case here, then it is provided, " that the estate so purchased shall be had and held by the trustee for the same uses and purposes as are declared concerning the property first mentioned, that is, for her own use and benefit."

The fourth provides, that, on Castle's death, the property held in trust at the time of his death, shall be re-conveyed to Mrs. Castle.

The fifth provides for the appointment of new trustees on certain contingencies.

Now it seems to me, the complainant, by these clauses, intended to retain, and did retain, the absolute control of this estate. She made no appointment of uses, except to herself, that is certain. It was her separate estate at the outset, with which she could do, before the contract of marriage, as her whim and caprice might dictate. She is " minded " to transfer and convey it, with the consent of her intended husband, to a trustee, for " her own use and benefit." The trustee accepts it

with that understanding—the intended husband consents to the transfer, and to the trusts declared upon it, that upon her written request, and with her approbation, the trustee may sell the whole or any part of it. It is assented to and agreed by all the parties, that if sold, the proceeds shall be invested in other real or personal estate, or paid over to her, as she might elect, on giving written directions to that end. The estate first conveyed was sold, and the proceeds invested in the property known as the Park Avenue and Holstein property, conveyed to Swift as trustee for Castle's creditors, by these deeds which the court has set aside and rendered null and void. Now *this* property, by the terms of the ante-nuptial agreement, was to be held by the trustee for the same uses for which the property described in the deed and first conveyed, was to be held, and that was, " for her own use and benefit," clearly preserving the character of the estate as it was when she conveyed it, that is, as her separate estate.

I put the question, what did Mrs. Castle reserve ? The mere use of the estate, when by the terms of the deed she could direct the property to be sold and put the proceeds in her own pocket ? Suppose she had directed it to be sold, and directed in writing the proceeds to be delivered to her, will it be contended those proceeds when delivered were still in trust— that the trustee is not discharged, and the purchaser under him would get no title which this court is bound to respect?

It does seem to me that stronger or clearer language to express the intention of retaining absolute control over her separate estate could not be used. She declares the conveyance in trust is for her own use and benefit, and for no other persons. She declares she may direct in writing a sale of the estate or any part of it, and if the trustee is not directed to re-invest, he must pay the proceeds of the sale over to her, if so directed.

This deed, if a deed can do so, contemplates that under the forms prescribed in it, the grantor is, notwithstanding her marriage, a *feme sole* as to this property. There is no restriction whatever, of any kind upon her power. It was her separate property when purchased, and continued to be her separate property by the terms of the deed. So far from manifesting an intention to deprive herself of her power of disposal of this estate, or to retain the use of it only, the contrary is most clearly expressed. When the trustee receives the written directions of Mrs. Castle to sell the property and pay the proceeds over to her, and does so, he is, on that instant, discharged from the trust, for the property cannot retain its trust character, when the *cestui que trust* has come into possession of it lawfully. Can they be pursued and taken out of her hands, and she be compelled to

surrender them to the trustee for investment in other real or personal estate, and is there any power on earth that could restrain her in the appropriation of those proceeds? She alone had the power under the deed to direct a sale, she alone had the power to direct the appropriation of the proceeds, and in her disposition of them she was the sole judge as to the objects on which they might be bestowed for her use and benefit, and of that she was also the exclusive judge.

Suppose the trustee, by her written directions, had sold the estate for thirty thousand dollars, that being about its value, and had paid the money over to her, where resides the power that could prevent her from paying these creditors with the money and discharging her husband's indebtedness with less than one-third of it? No such power exists anywhere. Then, if she could sell the estate and apply the proceeds in that most praiseworthy manner, why can she not encumber it for the same purpose? Shall it be said that although the power is retained to sell absolutely, she shall not sell conditionally? The greater power includes the less, and there is no restriction in the deed. She being a *feme sole* as to the property, it being her separate estate originally, she cannot, any more than a man, have a certain, ascertained and indefeasible property, without having that power over it which the common law considers as necessarily incident to property, and that is, the power of disposing of it absolutely or conditionally. It is a truism, if a man is qualified to dispose of his property absolutely, he is qualified to dispose of it conditionally. It has always been held everywhere, where the common law obtains, and under all circumstances, the person for whose use and benefit property is held, can direct its appropriation, if not restricted, as to mode or purposes. This is an universal principle, pervading not only all the books, but is a dictate of common sense. This, I think, is the first case where all the parties in interest, joining in a deed, executed with all the solemnities of the law, conveying that interest, and where no fraud is pretended, and no restrictions on the power to convey, imposed, are declared incapable of doing so, and their conveyance held to be null and void.

The property conveyed by these deeds to Swift, the appellant here, represent the property first conveyed to Thomas Whitlock, and is held by Filkins, his successor, for the same uses and under the same trusts as declared in that deed, the uses being for her own benefit—the trusts being that he would sell it on her written request, and either re-invest, or pay over the proceeds of the sale to her. If sold by her written directions, the purchaser would certainly get a good title, and if he pays over the proceeds to her, taking her receipt, he is forever discharged from

the trust. With these proceeds, Mrs. Castle could found a charity, invest in stocks, or apply them to the noble purpose of relieving her husband from his embarrassments.

In the case of the Methodist Episcopal Church, so much relied on, Chancellor Kent admits the power of disposal by the wife, but insists on an observance of the mode prescribed by the deed to her. The whole tenor of that case is nothing more than this, that the deed of settlement required a deed in order to divest the wife of the property—she was so restricted by that deed, and therefore a mere parol gift to her husband was insufficient. No one can doubt, if there had been a deed from the wife, assigning to her husband the Hoyle mortgage in the form and mode prescribed by the deed of settlement, that the husband would have held the property. And such is the drift of almost all the cases cited.

The chancellor admits " the cases are certainly in favor of the position, that a married woman is considered in equity with respect to separate property as a *feme sole*, and is held to have an absolute dominion or power of disposition over it, unless her power of disposition be restrained by the deed or will under which she became entitled to it." He then says: " The next question then is, when does the deed restrain her? I think she is to be deemed restrained, in the present case, to the *modes* of disposition *mentioned*, and that her husband cannot set up any less solemn alienation against her."

That solemn mode exists in this case. The deed is made by Mrs. Castle, the *cestui que trust*, by Joseph Filkins, the trustee, and by Edward H. Castle, the husband, under all the forms and solemnities required by law, no fraud, duress or undue influence appearing, and no point made by the court on that suggestion, though, judging from the labor bestowed on it by complainant's counsel, is what he deemed the strong point in the case, but which the court have ignored. What would Chancellor Kent have said in Jaques' case, if he had had this solemn mode of alienation? Can there be any doubt what he would have said on such a fact appearing?

The deed of settlement in Jaques' case, does not differ very essentially from the one before us. In both, the absolute disposition of the property, to be manifested by a certain form of disposal, is to be at the pleasure of the wife. In *this* deed, plainly appearing in the third clause, " that the said trustee shall have power, with the approbation, or at the request of said Emeline Bennett, expressed in writing, to sell and dispose of the said trust estate or any part of it."

This power is a continuing power, and attaches to all the investments that might be made by the trustee out of the pro-

ceeds of the property first conveyed, and Mrs. Castle's power over it would continue to be absolute, through all the phases it might assume. This, indeed, is the complainant's own construction of the deed of settlement, as appears by the bill of complaint, for she claims to have the deeds to Swift set aside, because they are not made for the purpose of re-investing the proceeds in other property, personal or real, to be held on the same trusts for the complainant, nor for the purpose of delivering over the proceeds to her, nor for the purpose of appropriating them in any way beneficial to her, but for the payment of money she was not bound to pay. This may all be, but she, having directed the property to be disposed of, in the manner and for the purposes directed in her written and solemnly executed deed, it is not now in her power to say it was not for her use and benefit. She determined that question for herself when she executed these deeds, and it is now too late to object. She has decided and acted, and there is no *locus poenitentiae.* This construction of her deed of settlement, as claimed by the complainant, should estop her, and should prevent the court from granting the relief prayed. Her construction of the deed, seems to me inconsistent with the principles on which the court have granted the relief, for if she had the power of disposal, as she claims to have had, and insists she had by the bill filed, how can the court say, she had not this power ? She does not allege she had not the power, but that she has exercised it in a mode, and for a purpose, not contemplated by the deed of settlement. She does not ask the court to deny her the power—that is not the case she makes by her bill, and if she had asked it, the court could not grant it, for the reason that the court cannot make contracts for parties. This court has repeatedly decided, that a complainant in chancery must recover according to the case made by the bill. The complainant must be held to his own statement of his case, and recover on that, or not at all. *McKee* v. *Bissett,* 5 Gilm. 505; *Morgan* v. *Smith,* 11 Ill. R. 200; *Rowan* v. *Bowles and Wife,* 21 ib. 17. How then, I ask, can this court, in this case, permit this complainant to recover against her own showing ?

But to arrive at a proper understanding of this deed of settlement, the whole of it must be considered, not detached parts of it, or obscure phrases. Is there no efficacy to be given to the covenant of the husband ? That is as follows :

" And the said Edward H. Castle doth for himself, his heirs, executors, administrators, and assigns, covenant and agree, to and with the said Thomas Whitlock, in manner following : that is to say, that if the said intended marriage shall take effect, he, the said Edward H. Castle, shall and will permit and suffer

the said Emeline Bennett to give, grant, and dispose of her said separate estate as she shall think fit in her lifetime, and to make such will, or other writing as aforesaid, and thereby to give, order, devise, limit, and appoint her said separate estate to any person or persons, for any trust, use, intent or purpose whatsoever; and that the person or persons to whom the said Emeline Bennett shall give or dispose any part of her said separate estate by her will, or any other writing that shall be signed, sealed, and executed by her in the presence of two or more credible witnesses as aforesaid, shall, and lawfully may, peaceably and quietly have, hold, use occupy, possess and enjoy the same, according to the true meaning of such gift and devise or appointment, without any denial, hindrance, or interruption of or by the said Edward H. Castle, his executors, administrators, or assigns, or any of them."

·I think this covenant is entitled to great consideration in placing a construction upon the deed. · In marriage settlements like this, the object generally is to guard against the legal effects of a marriage, which, by operation of law, would divest a wife absolutely of her personal property, and take from her, during coverture, all control over her real estate. The motives of the wife can never be to guard against herself, but to retain dominion over her estate, and to prevent her intended husband from intermeddling with it any farther than she may choose to allow. The husband, by becoming a party to the deed, concedes away his marital rights. Now it would be strange indeed, if the husband entering into the deed, which would be of no effect if he did not, should not be permitted to control and qualify the deed by such conditions, restrictions, limitations and grants, as he may choose to couple with such consent. His part of the deed, assenting to the powers which his intended wife reserved, must be used in connection with other parts of it, to ascertain the meaning of the whole. There are two covenants by the husband, the first clearly and explicitly yielding to the wife the absolute and unlimited control, with the sole restriction that her alienation of the property shall be by writing, signed and executed in the presence of two credible witnesses. The other is general in its terms, that she shall receive the rents and profits, and that he will not interfere with the trust estate, and sufficient of itself to indicate his consent to the settlement. Why then, it may be asked, was this special covenant inserted, if it was not for the purpose of more clearly defining her powers? It must be regarded as a grant of power by the husband to the wife, of unlimited control, or at least an acknowledgment of such power. To arrive at the point of how much power the wife retained, or the husband granted to her, over her separate

estate, we must not cast entirely aside a clause in which the husband, in plain language, covenants that she shall have certain powers, and which must attach to the property, whatever form it may assume.    This is not allowed in construing such instruments. This covenant then, by the husband, is something more than mere form, and yields up to the wife the unlimited control of the estate.

And why should she not have the control?   It is claimed it was her separate property at the outset, and being so, nothing can be more just than that she should control it, her husband consenting.   One purpose was, undoubtedly, as the courts say, to keep it free from, and unaffected by, the creditors of her husband, to which it might, if not settled upon her, be subject.   It was not designed to tie it up, so that she could not dispose of it, hence the necessity for a trustee or an instrument of conveyance, if a sale was desirable.   That a sale of the property was contemplated at some time, appears from another clause in the deed, not adverted to, which is, that the purchaser should not be required to look to the application of the proceeds.   This was to render the property more saleable.   Suppose the property should depreciate in value, and yield an income insufficient for her support, has she not the power to dispose of the whole or a part for such purpose, or for a marriage portion for her son or daughter, or to defend her title to the property, should it be attacked?   For these and all conceivable purposes she retains the control.   It being her own property, no good reason can be given why she should not alienate at her pleasure, restricted only by the mode prescribed.   Some one had the control of this estate, and if it was not the owner, who was it, under the various clauses of this deed of settlement?

But upon the law of the case, and the rule as declared in Jaques' case.   I have examined all the authorities cited by Chancellor Kent within my reach, and I undertake to say, as the eminent counsel in the Court of Errors said, that before the decision by Sir R. Pepper Arden, afterwards Lord Alvanly, in the case of *Socket* v. *Wray*, in 1793, and on which the eminent chancellor so much relies, there is not a single decision or a *dictum* to be found in the books, prior to that time, against the doctrine that the wife has the absolute ownership of her separate estate, under a settlement.   Clancy, in his Treatise on the Rights of Married Women, says: " That case seems to have been decided against the principle of all the authorities on the subject of the wife's separate estate."   Clancy's Rights of Married Women, 298.   At page 301, he also says, that the decision is directly at variance with the doctrine laid down in some prior leading cases on the subject, and has not been followed in any subsequent case.

Lord Thurlow, with the greatest desire to put a restraint on the wife's power of alienation, declared notwithstanding in the case of *Ellis* v. *Atkinson*, 3 Broke's C. C. 347 — 565, that " as the 2,000 pounds was in the absolute power of the wife, and no appointment intended for her children or other purposes, and it was evidently her pleasure to give it to her husband, he did not see how he could prevent her." He bowed to the authority of prior decisions.

After the case of *Socket* v. *Wray* came the case of *Whistler* v. *Newman*, 4 Vesey, 129, and *Mores* v. *Huish*, 5 ib. 692, decided by Lord Loughborough siding with *Socket* v. *Wray*. These are the cases chiefly relied on in the Jaques case, and are the only well-considered cases that interrupt the current of decisions from the time of Lord Macclesfield down, and their influence was short lived. How it can be said that the English decisions " are so floating and contradictory as to leave us the liberty of adopting the true principle of these settlements," or why decisions of a century do not eliminate " the true principle," I am at a loss to discover. There are four or five decisions only on one side, and more than fifty, by the most learned jurists, on the other. The decisions of Sir Pepper Arden and Lord Loughborough have not been followed by any of their successors, neither by Hardwicke, Talbot, Thurlow or Eldon. Lord Eldon, in *Sperling* v. *Rockfort*, 8 Vesey, 164, says: " Wishing that the law may turn out for the protection of married women, to the extent in which it is represented in *Whistler* v. *Newman*, I find it impossible to reconcile all that is said in that case to former cases." And in *Parkes* v. *White*, 11 Vesey, 209, he says: " In *Whistler* v. *Newman*, if it is asserted that though Lord Thurlow, following his predecessors as far back as the doctrine can be traced, repeatedly decided upon this principle, this court has now a right to refuse to follow it, I am not bold enough to act on that position."

Clancy, page 319, says that " the two decisions of *Whistler* v. *Newman* and *Mores* v. *Huish* are quite contrary to the course of the authorities which were previous to them, and accordingly they have been overruled by the cases of *Wagstaff* v. *Smith*, 9 Vesey, 920, *Sturges* v. *Corp*, 15 ib. 190, *Essex* v. *Atkins*, 14 ib. 542, and the other subsequent cases." He concludes by saying, page 321, " It therefore may now be considered as the settled law of our courts of equity, that wherever property has been given to the separate use of a married woman, the gift being unaccompanied by any power of appointment, she is so far to be treated as a *feme sole* in respect to it, that she may (as in cases where she has the power of appointment) dispose of it by will or by grant of an annuity out of it, and that

she may sell her reversionary interest in it," referring to *Wagstaff* v. *Smith*, 9 Vesey, 920, *Brown* v. *Like*, 14 Vesey, 302, and *Sturges* v. *Corp*, 13 Vesey, 190; and he further says, "And these cases also prove that a *feme covert* having separate property, with or without an express power of appointment, may exercise her right of ownership over it, without the consent of her trustees, and even in opposition to them, unless the terms of the gift require their concurrence, however improvident the transaction may be, provided it does not appear that she was coerced on the occasion, or that any fraud had been practiced upon her," referring to *Grigby* v. *Cox*, 1 Vesey, Sen., 517, and *Essex* v. *Atkins*, 14 Vesey, 542.

From the time of Lord Macclesfield, in 1740, and anterior thereto, down to the case of *Socket* v. *Wray*, in 1793, the current of decisions was unbroken. Sir Pepper Arden cast into it one small pebble, followed by Lord Loughborough with two of larger size, but they failed to impede its force. It has flowed on to our day with undiminished power, not rippled even by the futile efforts of these distinguished jurists, and no English chancellor, and but few in our own country, have repeated their experiment.

But Chancellor Kent's opinion is not the law of his own State, and never was. His decision was reversed by the nearly unanimous opinion of the Court of Errors, the highest judicial tribunal of the State of New York. See *Jaques* v. *M. E. Church*, 17 Johnson's R. 548. That court was composed of Spencer, Chief Justice; Van Ness, Platt, Yates and Woodworth, Associate Justices of the Supreme Court, and also of the Senate of that State, and among the Senators was Martin Van Buren, a lawyer of great eminence. They were all against the chancellor, he being sustained by two Senators only, and they of no known reputation as jurists. Chief Justice Spencer, and Platt, Justice, delivered elaborate opinions, recognizing the well-established doctrine, and in my judgment, the true doctrine of the English chancery, and that is, that a *feme covert*, with respect to her separate estate, is to be regarded in a court of equity as a *feme sole*, and may dispose of her property even without the consent or concurrence of her trustee, unless especially restrained by the instrument under which she acquires her separate estate; and though a particular mode of disposition be specifically pointed out in the instrument or deed of settlement, it will not preclude the adoption of any other mode of disposition, unless there are *negative* words restraining her power of disposition, except in the very mode so pointed out. This decision was made in 1820, and has been affirmed and followed ever since, by the highest courts in that State. *North Ameri-*

*can Coal· Co.* v. *Dyett,* 7 Paige Ch. 14; *Gardner* v. *Gardner,* ib. 112; *Guild* v. *Peck,* 11 ib. 20; *Dyett* v. *American Coal Co.,* 20 Wendell, 573; *Fireman's Insurance Co.* v. *Bay,* 4 Barbour, 413. And such is the doctrine recognized by Justice Story, 2 Story's Eq. Jur., §§ 1390, 1395, and of the eminent Chancellor Dessaussure, of South Carolina, in *Erving* v. *Smith,* 3 Dessaussure, 417.

Lord Chancellor Eldon, in the case of *Parkes* v. *White,* 11 Vesey, Jr., 209, in 1805, reviewed these cases decided by Sir Pepper Arden and Lord Loughborough, and distinctly says, (page 226): "I do so much doubt the authority of *Whistler* v. *Newman,* that I desire, when this cause comes on again, that case may be very fully considered." He also remarks on this case, (page 222,) that "it must be considered how far it is consistent with the preceding authorities; if it is not, then whether it was competent to the court in that year to refuse to make a decree consistent with all the declarations of this court for a century." Lord Eldon lays down the rule to be, that "a married woman, having an estate to her separate use, is capable of disposing of it, provided the transaction is free from fraud, and no unfair advantage is taken of her."

The following are some of the cases decided in the English chancery, establishing this doctrine: *Powell* v. *Hankey,* 2 P. Williams, 82; *Norton* v. *Truvill,* ib. 144; *Ridout* v. *Lewis,* 1 Atkins, 269; *Stanford* v. *Marshal,* 2 ib. 69; *Penne* v. *Peacock,* Cases in the time of Talbot, 41; *Hulme* v. *Tenant,* 1 Broke's Ch. C. 16; *Pybus* v. *Smith,* 3 ib. 340; *Newman* v. *Carlong,* ib. 347; *Fettiplace* v. *Gorges,* ib. 8; *Squire* v. *Dean,* 4 ib. 326; *Allen* v. *Papworth,* 1 Vesey, Jr. 163; *Grigby* v. *Cox,* ib. 517; *Peacock* v. *Monk,* 2 ib. 190; *Smith* v. *Camelford,* ib. 698; *Paulet* v. *Deloone,* ib. 663; *Parkes* v. *White,* 11 ib. 209; *Healty* v. *Thomas,* 15 ib. 596; *Dolbine* v. *Dolbine,* 16 ib. 126.

I have not time to pursue the search farther. It is sufficient to say, that such is the rule of a court we are apt to regard as authority on all questions of this kind, and if we should happen to think their decisions are not founded in good reason, still it has ever been the uniform practice of this court to yield to them. I can say with Lord Eldon, in the case of *Parkes* v. *White:* "If it be asserted that this court has now a right to refuse to follow them, I am not bold enough to act upon that position." We look to the decisions of these courts, and not to that of one distinguished man, as evidence of what the law is, and we are quite likely to find the law in them correctly expounded, if anywhere. It is also understood, that a long and uninterrupted series of decisions on a point, establishes the point. Danger is to be apprehended in departures, no matter who may lead off.

With this rapid review of cases, it may not be arrogant or impertinent to suggest that Chancellor Kent has fallen into the error of supposing, with Lord Loughborough, that trustees were created for the protection of the wife, and " to contribute, as he says, the only sufficient shield against the undue, secret and powerful influence of the husband." .

It was urged against this view in the Court of Errors, that trustees were introduced in settlements of this kind, not as the counsellors and champions of the wife against the husband, but to avoid and evade the principles of the common law, by which the husband is not allowed to be the grantor or trustee of his wife. By that law, after marriage the personal property of the wife belongs absolutely to the husband, and he also becomes entitled to the rents and profits of her real estate. And that by adopting at an early day, as the English chancery did, much of the principles and practice of the civil law, the way was opened to the adoption of the rules of that code in relation to the property of married women, and in upholding the notion of a separate estate in the wife, and allowing ante-nuptial contracts which that court did, the inference must be, that it adopted the whole of the law as it was found in that code, and in the codes of all the European nations which had adopted that system, and that was, that the wife should have the entire and absolute control and disposition of her separate estate. That in adopting the rules of that code, this principle was adopted, and whilst designing to restrict the husband in his common law right, it never intended to restrain the wife and place her under disabilities not known to the civil law. But as this could not be done so as to bind the courts of common law, resort was had to the well-known agents of a court of chancery, and the property vested in trustees as mere instruments of conveyance. That court adopted this argument, and properly.

Is it not preposterous to say a wife shall not, to save her husband from disgrace and ruin, forego a settlement of her property acquired by her own means, and when, in the deed of settlement, she has expressly retained the power to sell it? Is she not to act upon the suggestions of her own noble and generous heart? Is she not permitted to blend her fate with her husband's, and to give her all to save him? or is the picture more captivating, when ruin stares him in the face, and he stands dismayed amid the wreck which misfortune has brought upon him, to see the wife wrapping herself up in her own selfishness, clinging to her property, consoling herself with the reflection, that she is safe and uninjured. Should she surrender her separate property to relieve her husband, she would be in a situation no worse than the common law placed her, and which, in my judg-

ment is most consistent with the marriage state and the true policy of society. Marriage is a farce, and its relations by no means desirable, if a wife, of her own free will, cannot be permitted to sacrifice her estate for her husband, and the idea of any interference in matters of property, to stifle the impulses of affection or duty, is not conducive to the peace and happiness of families. The civil law and the wisest chancellors of England, approved the wife putting herself under the conduct of her husband, and of entrusting him, rather than another, with the management of her estate; and Lord Eldon, in *Parkes* v. *White*, before referred to, said, " if the husband conducts himself well, he did not know that she could make a more worthy disposition of her interest than to give it to him, though the particular act should be looked to with jealousy."

There might be a distinction, though the books make none, between the cases where property not originally the wife's is settled upon her by deed or will, and where it was her own originally. In the former case she might well be held restricted to the mode and purposes expressly specified; in the latter, being her own property, and her object being to protect it from her husband's liabilities, she ought to have, unless she has expressly restricted herself, full power to subject it to his creditors, if she should desire to do so, or dispose of it in any other way. Like the States of this Union, possessing all powers, originally, they can exercise all they have not surrendered to the Congress, unless specially restricted by their own deed—the Constitution. But the Congress, acting under granted powers, not originally possessed, can exercise none but those granted.

These being the views I entertain of the construction which should be put upon the ante-nuptial agreement or deed of settlement, and of the law of the case as delivered by Lord Hardwicke and his successors, with but rare departures from their rulings, I am of opinion that the decree should be reversed, and the deeds of trust to appellant established.

Separate opinion by CATON, C. J.

After the presentation of his views, by my brother BREESE, I felt apprehensive that we might have fallen into an error in the opinion which had been adopted. This apprehension, together with the very high respect which I ever feel for his opinions, imposed upon me the conscious duty of again, with the greatest care, examining the whole subject, with all the accessible authorities on both sides bearing upon it. I arise from this re-examination without a doubt upon my mind that we have decided the case correctly, and that the rule of law which we have laid

down in the principal opinion, is supported by the weight of authority and reason too, as reason addresses itself to my mind. I cannot, after examining all the English cases on both sides, but agree with Lord Eldon and Chancellor Kent, that those decisions are so contradictory, and the rule of the English court so fluctuating, as to embarrass rather than elucidate the inquiry. Kindred questions arising out of marriage settlements, are almost infinite, variant from each other by the slightest shade, which, however, may control the decisions, and without the closest scrutiny and discrimination, these tend further to embarrass the subject.

Upon no controverted legal question is it more easy to account for the diversity of decisions and conflicting opinions, than upon this. Those judges who endow the wife with the greatest powers under the marriage settlement, and thereby afford to her rights the least security, are universally found to condemn the policy of giving to the wife any estate beyond the control of the husband, as tending to a pernicious influence upon the marriage relation, while those who approve the policy of allowing marriage settlements, uphold them in their spirit and meaning, as they conceive, by following those decisions which give the greatest security to the settlement upon the wife in refusing to extend her power to alienate the property beyond that which is expressly given her in the deed of settlement. This is but obedience to a law of human nature. To every humane mind, that reasoning is the soundest which most tends to promote that which it deems to be the greatest public good, or the end most to be desired. Hence we find, upon many of the most important questions affecting human rights, parallel lines of conflicting decisions running down through a long course of years, kept up and maintained by the accidental circumstance that the judges upon whom the duty of deciding devolved, in the various courts and in different ages, entertained different views as to what would best promote the ends of justice and the public good. Most eminently do the decisions upon this question illustrate the truth of these remarks; if we will but examine those which have been made on both sides. Of course, if we examine but one side of any question, we see and appreciate only that side, and then it is not difficult to present it in strong colors.

After so much has been said, and so well said, by my associates, it would be unpardonable in me again to go over and review the decisions which have been made on this subject. They all agree that the wife may exercise all the powers in the disposition and use of the property which are expressly conferred on her by the marriage settlement, in the mode thereby specified, and most agree that where a right is given by the

marriage settlement and it is silent upon the subject, she may appoint the same as a *feme sole.* But where the marriage settlement specifies one or more modes of appointment, or states a particular object *for which* the property *may* be sold, without negative words as to any other mode, or for a different object, whether she may appoint in any other mode than that specified, or for a different object than the one stated, is the question upon which the principal controversy has arisen. Upon this question the decisions, both in England and in this country, are both ways. In England the greatest number, if counted, will be found to be in favor of the power. In this country, not only the number of decisions, but in a majority of the States, those against the power very greatly preponderate. This presents the state of the adjudications on the subject as fairly and impartially as I am capable of understanding it. In this conflict of authority, I do not hesitate to go with the great current of American decisions, supported as these undeniably are by a number of English decisions, admitted by all to be entitled to the very highest respect. It does seem to me that the maxim that the expression of one thing is the exclusion of another, is directly applicable to this question.

The cases all agree upon another question, which in argument has been discussed in this case, and that is, that the marriage settlement is to have the same effect and construction where it is made by the wife before marriage, as where it is made by a third person. The very object of a marriage settlement may be to protect the beneficiary as well against her own weakness and yielding disposition in her dependent condition, as against the improvidence or dissipation, or even misfortune, of her husband. Upon another question also the cases are all agreed, and that is, that where a particular mode of appointment or object is specified, and negative words are contained in the deed, pointing to that mode or object, that negation absolutely forbids any other mode, or an appointment for any other object. It so happens in this case that the deed of settlement does contain such an absolute negation in terms which admit of no doubt or ambiguity. The *habendum* clause of the deed is in these words: "To have and to hold the said real and personal estate to the said Thomas Whitlock forever, but upon the special trusts, and for the uses and purposes, and subject to the powers and obligations following, *and none other*, namely: " The only declarations of the trust which authorize the disposition of the property, are found in the third specification, and are that the trustee may sell the property with the written consent of the wife, either for the purpose of investing the proceeds in other personal or real estate, to be held subject to the same trusts, or

16

Swift et al. *v.* Castle.

for the purpose of paying the money to her. By the deed then, the trustee could dispose of the property in this mode and for these two objects, but in no other mode and for no other objects. Here then he was expressly forbidden to convey this property to a trustee for the benefit of Castle's creditors, and I venture to say that no case can be found authorizing the disposal of the property, in defiance of the express restraint of the deed creating the trust, and yet such is undeniably the case here, and we are called upon to sanction the sale. I cannot appreciate how there can be any diversity of opinion on this point.

While writing upon this case, I will state another ground upon which I have no doubt this conveyance ought to be set aside, and that is, the circumstances under which this deed was executed by Mrs. Castle. Admitting her authority to execute this deed, all agree that the act must be done freely and voluntarily, without coercion or constraint of mind or body, and without undue influence by flattery or by fear. I have never heard of a case where, to my mind, more unwarrantable means were resorted to in order to induce a married woman to execute a deed. She was at the time *enciente,* and in a high state of nervous irritability, as her physician tells us. Her husband was overwhelmed with debts, and was arrested on a criminal charge preferred by his creditors, for a conspiracy to obtain goods under false pretenses, an examination of which was then in actual progress, and had been for some days. The daily papers, which were taken in the family, were teeming with accounts of the trial, of the most alarming character. Her husband assured her, and there is not a shadow of doubt that she believed it, that he must go to the penitentiary unless a compromise could be made with his creditors, and the prosecution thereby stopped, and that the only possible means of doing this was by her signing this deed, and unless it was done he threatened to commit suicide, as preferable to the penitentiary. With a resolution hardly feminine she resisted every appeal and every appliance to coerce submission to this dire necessity, till this last pretense, and this picture of horror was presented to her view by her own husband. This statement was false, for the offense, if proved, was not punishable in the penitentiary. This is but a slight sketch of the constraining means resorted to in order to coerce this woman to dispose of the means which she had provided, at the time of her marriage, for the support of herself and children, and her husband also, that she might not be utterly destitute in case misfortune should overtake him ; and which she designed should be beyond the reach of his creditors in every contingency. And in this I omit the interference and influence of apparent strangers, and the visits to her by the

attorneys of the creditors, and their allusions to the criminal prosecution. Was this deed executed freely and voluntarily? I can conceive of no more potent coercion than was here applied to this pitiable object of affliction, in her day of sorrow, enforced as it was with a falsehood, without which, in all probability, she would not have yielded. The resolution of a woman who would laugh at the thumbscrew and endure the faggot with firmness, would melt in a moment before the picture of the states prison and the suicide of her husband. Not to have submitted to his demands then, and the demands of his creditors, whom she was made to believe had the means, and would surely exercise them, of sending her husband to the penitentiary and drive him to despair and self-destruction, she must have been more or less than woman, and certainly not worthy the name of wife. Can it be that our law affords no protection to a wife against such false and fraudulent statements, and against such moral force, more resistless than any physical force of which we can conceive? If she acted the part of a noble wife by yielding, what shall we say of those who drove her to this dire necessity, for the purpose of forcing from her this last resource, which was her own before her marriage, and upon the faith of which no credit was ever given to her husband? When flattery and caresses may exert so improper an influence over a wife as to avoid her deed, shall it be said, in a civilized land, that a deed extorted from a married woman, under a pressure which nothing but a heartless demon could have resisted, was a free and voluntary act? Had her infant been suspended over a boiling cauldron, or had the mother been placed upon the rack, and had this deed been executed as the only means of obtaining their release, a compliance under such circumstances would have been as much her free and voluntary act as this. She choose to do this rather than bide the consequences of a refusal. She was free to do the one or suffer the other, and that was all the freedom, there was in the case. I, for one, do not believe that the law can sanction such practices nor give validity to a deed executed under such influences. But I agree that the decree can be affirmed without reaching this point, and hence consent to waive a direct decision upon it. I adhere to my concurrence in the principal opinion and in affirming the decree.

BREESE, J. Waiving all consideration of the novel course the Chief Justice has adopted, I feel bound to submit my views on the new point he has introduced into the case, which had been by the whole court, previously ignored. Before doing so, however, it becomes necessary for me to say that I have re-examined all the

authorities, both English and American, to which reference has been made, and feel well assured there is nothing in them, or in any one of them, to sustain the majority of the court in the conclusions to which they have arrived on the principal question, that is, the power of a married woman, who has settled her separate estate upon a trustee for her own use, to dispose of it in the mode prescribed by the deed of settlement, with the concurrence of her husband and her trustee, they joining in the deed.

I insist, no case can be found in the books, English or American, where this power, thus executed, has ever been denied or even questioned. This case is the solitary case, standing out unsupported by authority or precedent, denying the power. I will not go over any part of the argument again, but invite a full examination of all the cases cited. I feel sure those cited by the majority of the court, as well as those by myself, fully maintain the views I have presented.

Upon the new point I have this to say, that it is the first case in our history where a deed has been avoided by reason of a supposed undue influence having been exercised upon the wife by the husband, to induce her to execute it. I need not remark upon the danger to be apprehended from the precedent, nor upon the consequent insecurity to titles to real estate. It is very easy to get up cases like this. I do not question that the separate examination of a wife may be falsified, although attended with great risk in every case, but I do insist that the evidence to that effect shall be clear and convincing, and of the most undoubted character, such as shall amount to the proof of fraud or duress at least.

Now, I submit, there is an entire absence of proof of this character, and none whatever of undue influence or coercion on the part of the husband, and no complicity shown on the part of the creditors to be benefited by the deed, with any acts of misconduct, if any there were, done and performed against the wife, to induce or compel her acquiescence in the execution of the deed, nor is there any proof whatever that they had any notice that improper means had been used to procure her assent and acknowledgment, although so charged in her bill of complaint. The complainant must have deemed such notice essential, for she alleges that at the time of executing the deed, Farnsworth and Wilkinson, the attorneys of the creditors, the payees of the notes, and who received the deed, and also the trustee, Filkins, and Davis, the notary public before whom the deed was acknowledged, had notice, and were aware that the signing of the deed and her consent given to the execution thereof, was not her voluntary act. The only testimony squint-

ing at undue influence on the part of the husband, and he is the only one who is pretended to have controlled her, will be fully stated from the record.

The first witness for complainant, on this point, is *William H. Davis*, the notary who took the acknowledgment of the deeds. He deposed as follows:

His age is fifty years; attorney at law; resides in Chicago. Has known the complainant about 12 years, before she was Mrs. Castle. Was present in his official capacity as a N. P. on 3rd May, 1856, to take acknowledgment of two trust deeds to R. K. Swift, made by Filkins, E. H. Castle and the complainant, at the then residence of E. H. Castle. Lived second house east, about 150 feet from them. Went there with Filkins, who lived next door. Entered the house at the basement door, east side. At the top of the stairs, as we entered the parlor, met Mrs. German, Mrs. Castle's sister; on entering the parlors, met Wilkinson and Farnsworth; Filkins and I went up together. Cannot state how long I was there before deeds were executed, but before execution, E. H. Castle invited them into a side-room, where they all took some brandy and water, and then returned to the parlors as formerly. After we returned to the parlors, I presented the deeds for Mr. Castle's signature; I then asked for Mrs. Castle, and I think Mr. Castle called her up stairs into the parlor, and Mr. Castle went away; Mrs. Castle sat down to the table on which the deeds were lying, and I particularly called her attention to the contents of the deeds, and the purport thereof, which she was about to sign, in the presence of myself, Mr. Filkins, Mr. Farnsworth, and Mr. Wilkinson. She informed me she knew the purport thereof, and signed the same in my presence. I then told her she had a right to retract, and if so, I would strike her name therefrom, and asked if she passed her signature with her own free will and accord. Her answer was, "Yes." Filkins signed the deeds immediately after Mrs. Castle did. After the execution of the deeds by Mrs. Castle, she retired into the back parlor, (the two parlors were thrown open by folding doors into one,) and sat on a settee or sofa, on which I observed her in tears, and, as a friend of the family, I immediately repaired to her, and sat down by her side, and endeavored to console her in her apparent trouble. At that time, Castle re-entered the parlors, and in a very great excitement, stating that he had been hard dealt by, cheated, robbed, and cruelly treated by those whom he had endeavored to assist, and alluded to one E. S. Castle, who, I think, he called his cousin—making all these assertions, and at the same time he was in tears. I spoke to him, and endeavored to persuade him to desist, and in all his trouble still to show him-

self to be a man. From his conduct, I felt somewhat alarmed, knowing the temperament of the man, for his situation. I communicated my fears to Mrs. Castle, and advised her to look well to him. Upon that she shook hands with me, and left the room. All of us then—myself, Castle, Filkins, Farnsworth, and Wilkinson—went again into the side-room, by Castle's invitation, and partook of some more brandy and water; after which, myself, Farnsworth and Wilkinson left the house from the front door entrance, the north end thereof, and went to my house. Thinks Filkins spoke to Castle when he was in tears, and others might have done so. No one, but myself, spoke to Mrs. C. while she was in tears, and before she left the room. Thinks Mrs. Castle did not appear again in the room before he left. When Castle called Mrs. Castle up stairs, he opened the door leading from the back parlor into the hall, on the same story he was in, and called her up stairs from the basement; she was not out of his sight. Thinks he rode up in carriage with Farnsworth and Wilkinson. Filkins was at his own house when witness arrived. Cannot state how long it was after he arrived at Filkins before he went over, but not long. Don't know where Castle then was. Thinks he came into the parlors immediately on their arrival. Came from side-room or door leading into hall. Cannot tell, but supposes Mrs. German was going down stairs, when he met her, to the basement below.

"The manifestation of tears by Mrs. C. exhibited to me, I think, from our relative positions, must have been in the presence of Messrs. Farnsworth and Wilkinson. Their position, in contradiction with me and Mrs. Castle, could not have been more than an angle from 21 to 24 feet from each other, the whole of us being in sight at the same time." Cannot give size of parlors ; thinks they are square. The sliding doors were then fully open, so as to throw the rooms into one. Thinks Mrs. Castle and Mrs. German are a good deal alike, and might easily be mistaken for each other; he had so mistaken them. I do not recollect as to time, but during the examination of the charge of conspiracy before Justice De Wolf, in which I appeared as attorney for the defense of one Parks, connected therewith, and from my connection with Castle during that time, he appeared more in a state of monomania than anything else. "My means of knowing" about the state of mind of Mrs. C., for a week or more next previous to the execution of the deeds, "was her calling at my house, both in my absence and presence. I had frequently met her, during the examination, on my return home, at my house, in which she expressed her anxiety for Mr. Castle's safety was extense, and expressed to me of a want of my opinion as to the result." By "extense" he means, "because her anxiety upon that subject

exceeded anything else, and was the principal topic of her conversation with me." She said she thought before he (E. H. C.) got through, E. S. Castle's matters would drive him mad. Has no recollection that, during these interviews, she said anything about the execution of these deeds. Before these deeds were executed, " my attention was called, either by Farnsworth or Wilkinson, which I do not recollect, as to my being particular in carrying out the statute law in its intents on acknowledgments."

On his cross-examination, he says: Does not recollect, while drinking brandy and water, to have pledged Mrs. C.'s health. Has no recollection of her being in the room. "Do you mean, by anything you have sworn to on this examination, to contradict your statements made in the certificates of acknowledgment, by you affixed to said deeds, respectively, or any part thereof?" Answer.—"No, sir." You knew Mrs. and Mr. Castle both intimately; had seen and conversed with them for days, before these deeds were executed, and there was nothing occurred, up to the time of the execution, that led you to believe or think that either of them were not in a condition of mind to dispose of their property, or that of either of them; if any such impression had been on your mind, you would not have taken the acknowledgment of said deeds. Ans.—I had known Mr. and Mrs. Castle intimately for years; I had freely conversed with them for days upon the subject matter, that is the examination; I believe Castle to have been very much excited during my frequent conversations with him and his wife, but not sufficient to induce me to refuse his acknowledgment; Mrs. Castle, at the same time, was extremely excited, but, in my opinion, not so much so as her husband, from appearance; and she said, during the examination, "do anything to save my husband; I am willing to do anything in God's world to save my husband." This expression was made in my house; I and Mrs. Castle, and, I think, Mrs. Davis and Mr. Filkins present, but not positive. Thinks Mrs. German was not *enciente,* judging from external appearances; thinks she was a widow of Mr. German who was killed at Panama, and is now the wife of Mr. Parks. Cannot say whether Mrs. Castle's appearance indicated that she was then *enciente.* Thinks she was not fully advised of what was going on in the examination. So far as he was concerned, he endeavored to prevent her knowing it, as he thought it would only make her more unhappy. Thinks that he and Filkins arrived at the top of the stair-case; met Mrs. German on the landing; spoke to her; went into the parlors, and Castle came in shortly after.

Then follows the deposition of *Marian Merrill.* She deposed she is a music teacher; 25 years old; resides at E. H. Castle's.

Has known E. H. Castle, his wife and Joseph Filkins about two years. On the 2nd May, 1856, lived at E. H. Castle's house, on Lake street, as teacher of music. " I was there " when certain trust deeds were executed by Mrs. Castle and others; I was away when the gentlemen called; as I went in I saw a carriage at the door; I met Mrs. Castle in the hall, crying; I asked her what was the matter; she told me it was the affair of Mr. Castle that troubled her; I then passed up stairs to my own room; soon after heard Castle speaking in a way that I knew he was feeling bad and crying; about ten or fifteen minutes after that, the gentlemen went away. It was a few moments after I met Mrs. Castle crying that I heard Castle crying. He was then in the parlor, and the witness up stairs. Was not on the same story with him. He talked in a loud, excited tone; indicated excitement; thought he was talking to the gentlemen. It was before they left the house. When I met Mrs. Castle in the hall, the parlor doors were closed. There is a door to each parlor, from the hall, on the right hand side as you enter. Were both closed. Mrs. Castle was then near the back parlor door, in the hall. Just as I was passing up stairs the hall door opened. Was acquainted with Filkins; knew Davis slightly; did not know the others. Mrs. Castle was then in a feeble state of health. For a week or ten days prior to that time E. H. Castle seemed excited and very irritable most of the time. His manner towards his family was very harsh at times; sometimes speaking so that we supposed he was not in his right mind. I learned from Mrs. Castle the cause of Castle's troubles. She told me he had been arrested for obtaining goods under false pretenses. She told me E. S. Castle was charged with them; don't remember any one else. Talked with her a good many days and times; can't recollect how often, but very frequently. Between the time of Castle's arrest and the execution of those deeds, she seemed very much disturbed and troubled, so much so that some days she would not take any food, and but very little sleep. She was fearful that Mr. Castle would permanently lose his reason, or that he might be sent to the penitentiary, take his own life or some of the family. During that time she told me Dr. Freer had told her to watch Mr. Castle. She said Dr. Freer assigned to her as a reason, that he might do injury to himself or family. I did hear her say something about signing deeds, and *think* it was to relieve Castle from his anxiety of mind, and, if possible, to save him from imprisonment. The witness is asked whether she ever heard anything said to Mrs. Castle about signing deeds; she then proposes to write her answer; this is objected to, but she does write and reads from her writing, to the commissioner, the following: " I only heard

Mr. Castle advise Mrs. Castle to sign the deeds; it was in their bed-room; she refused to do so; he took hold of her shoulder with one hand, her hair with the other, and told her if she did not, he would leave her. His manner was very fierce, and she seemed much frightened, and promised to sign the deeds." This occurred a few days before the deeds were signed; don't remember how long. She had heard the deeds spoken of before this time, but does not remember by whom. She heard Mrs. Castle once say she would almost as soon cut her right hand off as sign the deeds, but don't know whether before or after they were executed. Does not know that Filkins ever spoke to her on the subject. Saw him a number of times both before and after the arrest. Does not remember with whom he conversed when at Castle's. There are two stair-ways from the hall, one to the basement and the other to the rooms above parlor. My room was at the end of hall, up stairs. Above the parlors.

The deposition being read over, the witness qualifies her answer to the 30th interrogatory, by saying, I had talked freely with Mrs. Castle about signing the deeds; I understood the question at the time I answered it to refer to the other members of the family.

On her cross-examination she says: I am residing with Mr. and Mrs. Castle as a teacher. I teach their children, and receive pay from Mr. Castle. Has resided there ever since the deeds were executed, except a few weeks in winter and summer. Knows deeds were executed by Mrs. Castle on the 3rd of May, because Mrs. Castle told me so. She talked rationally on that day. There was nothing to show, so far as she could see, but that she was sane and in her right mind at the time. She seemed very anxious Castle's good name should be preserved from the stigma cast upon it by these prosecutions. Don't remember whether she expressed herself that she thought more of clearing that than anything else. She seemed anxious to hear how the prosecution was going on. Is not certain, but *presumes* Mrs. Castle inquired of her husband how matters progressed. Does not remember being present any length of time at interviews between them, when the matter was talked about in the family. The children, Mr. and Mrs. German, Mr. and Mrs. Castle and myself, were all that composed the family. At the time alluded to in her answer to the 28th interrogatory, she came into the bed-room and found Mr. and Mrs. Castle there. First heard Mr. Castle on that occasion speak about the deeds. That was almost immediately after I came into the room. Her reply to his advice to sign the deeds was in substance that she did not wish to do so. She did not assign any reason, for he immediately took hold of her and *forced her to consent.* She

gave the witness a reason for not wishing to sign the deeds. That she thought it unjust. She thought the debt for which their home would have to be sold was an unjust debt. I understood by it that if the deeds were signed the debts would then be paid. Does not remember whether she said the debts could not be collected out of E. H. Castle as they then stood. Cannot state that anything was said about collecting the debts at that time. Thinks these deeds were the subject of conversation when she came in the room. She merely happened in the room. Did not remain more than five minutes; went out immediately after I saw what the trouble was. Did not hear them talking before she went in. Does not know what was said or done after she left. ·

Dr. Freer was Mrs. Castle's family physician at that time. He was not then there more than usual. Castle spoke of his troubles to witness, but she can't remember what. Might have heard him converse on various subjects at that time, but not anything in particular. Sometimes he conversed rationally and sometimes not. He would frequently call us into the bedroom to see him die, for one thing. Can't say whether it was before or after deeds were signed. Don't know whether he had been drinking or not. Said many things before and after, not rational, but cannot state the time. Well, he at one time called me down stairs into the parlor, and wished me to select pieces to sing with his children at his funeral, which would take place in a few days. Thinks he had been at home all day when he called me into his room, as stated above. Don't know whether he kept liquor in the house; thinks he did. Don't think his state of mind was occasioned by drinking liquor. Don't know whether he had been drinking the day the scene occurred in the bedroom between him and his wife. Don't know where he had been that day. Thinks he had not been at home all the time. Did not see him drink any that day. Therefore don't know. My whereabouts in the room was, I just stepped in the door. Had Mr. or Mrs. Castle their faces towards you? Ans. I don't remember the exact position. You say Mrs. Castle looked frightened; she must then have had her face towards you, must she not? Ans. I was in the room a sufficient time to see her face, even if it had not been turned towards me. Castle was standing up at the time he put his hands on her shoulder and hair. Thinks he was standing in front of her, with his face towards her. Did he have his back or face towards you as you stood at the door? · Ans. I cannot remember his position. I immediately retired and closed the door as soon as I saw what was going on. Mrs. Castle told me at one time that this was a hard trial to bear from one's husband.

I do n't know anything about the size of the room where this scene occurred, but should think it was as large as this room; there was a door into it from back parlor, and also from the hall; it was used more or less as a sitting-room for all the family. Thinks it is smaller than back parlor in same house. Understood from what Mrs. Castle said, that the debts were those of E. S. Castle. She told me the *same afternoon*, and after that the gentlemen had left, that she had signed the deeds.

The next witness was *Israel L. Runyon*, who deposed that his age was 28; hardware merchant. Known Mr. and Mrs. Castle about six years; Filkins since 1847. On 3rd May, 1856, resided at Filkins'. In the same yard with Castle. Filkins' son-in-law. Was in Chicago on 3rd May, 1856, and had been told certain deeds were to be made of Mrs. Castle's property, to liquidate debts of E. S. Castle. About 12 o'clock saw some gentlemen come up from down town in a carriage; got out and went into Castle's house; Filkins and Castle came up about 11 o'clock; Filkins went into his house, and Castle to his. Davis came to Filkins' house a short time after Filkins came up from town, and they, Filkins and Davis, went into Castle's house, and were there about half an hour; Filkins then came back, and the other parties went into Davis', and the carriage drove away with the gentlemen from there, about 1 o'clock. The gentlemen in the carriage were Farnsworth and Wilkinson. Davis and Filkins went into Castle's house before Farnsworth and Wilkinson did. Thinks this occurred about 3rd of May; vacated his house down town about the first, and went to Filkins' about the 3rd. Had heard of the arrest of the parties, Castle, Filkins and Barker, about a week subsequent to this arrest. Saw Castle every day; seemed much troubled about it; thinks him at times not possessing his right mind. Thinks about 25th April, Filkins told him Mrs. Castle's property would be turned out to pay E. S. Castle's creditors. After the arrests made, Filkins told me Castle was willing to sacrifice everything to alleviate any talk or discredit that might come upon our firm. Filkins, witness and Barker constituted that firm. Saw Mrs. Castle on the morning of the transfer; she seemed very much concerned; asked her what was the matter; she said, you know what the matter is. I am afraid that Castle will do something desperate. The evidence I had of her concern was her unusual excitement, more than ordinary, and knowing that she was in the family way at the time. Her excitement was not in words; seemed to be full of grief and of serious misgivings of some kind; do n't know that I can give a fuller explanation of her feelings. Knows Mrs. German. Looks like Mrs. Castle; easily mistaken for each other.

On his cross-examination he said: knew Mrs. Castle was in the family way from her exterior appearance and my own observations. Was a partner of Filkins and Barker about two years before this arrest. Filkins lent his name to the firm of Filkins, Castle & Granger, but was not an active partner. Knew E. S. Castle. Was engaged in manufacturing trunks. That was all the business he had, to the knowledge of witness. Was never present at any interviews between Filkins, E. S. Castle, E. H. Castle, and Barker, or any of them, about buying goods in the name of E. S. Castle, and know nothing about it. Our firm sold him goods; do n't know anything about other sales. Knows nothing about inquiries being made of E. H. Castle, Filkins and Barker, as to character or responsibility of E. S. Castle. Did not know that E. S. Castle had a store in Dubuque. Did not hear Filkins mention it before January, 1856. Knows Filkins went to Dubuque; does not know what about; Filkins did not give much attention to the business of our firm.

The next witness was *Frederick R. Hamilton,* who deposed that he is in the milk business; lives near the west limits of the city, and in 1856 about a mile and a half from them. Has known E. H. Castle about 25 years; Mrs. Castle 8 or 10 years. Heard at his house of his arrest for obtaining goods under false pretenses. His wife first told me. Mr. German came to my house and told me Mrs. Castle wanted to see me; I called there, and she told me Castle, Parks, and others had been arrested for matters of E. S. Castle obtaining goods under false pretenses; appeared a good deal excited; asked me what I thought of it; I told her I though E. S. Castle would do anything to injure her husband, as he was a villainous sort of fellow; she said she was afraid of him; do n't recollect any more. Witness do n't recollect that anything was said at that time about a proposition to settle. About the 1st or 2nd May I was requested to call in; she told me they were trying, that her husband was trying, to force her to sign a trust deed, to settle this criminal prosecution; she told me that he had threatened her, if she did not do it, with a separation; also threatened his own life; I then asked her where Mr. Castle was; she told me in his own room, and asked me to go and see him; I did so; he told me he was not well, that Dr. Freer had been in to see him; asked him what ailed him; did not make much of an answer; said the Dr. said it was a derangement, nervousness; then he said, Fred., I do n't care whether I live or die; for choice, would rather die; rest of conversation was not directed to this. Mrs. Castle requested me to call in on this occasion. She was in the back sitting-room while I was talking with Castle. Saw her afterwards, but did not talk with her on that subject before I left the house.

She asked me if she had better sign the deeds ; I told her she must act her own pleasure, but I thought she was giving her property away.   She said they wanted her to deed the Lake street and Holstein property.   I believe she said in that conversation that if it was E. H. Castle's debts she was paying, she would not object so much ; she though it was debts E. S. Castle ought to pay, and she did not like to pay his debts.   She said nothing to me about the reasons that induced her to think of deeding away her property.   She told me she was afraid it (the prosecutions) was deranging his mind; not the same man that he was ; she was also afraid it was injurious to his health ; that's about the substance.   She told me, but I can't say it was at that time, that she had neither eaten or slept since the service of the papers, and that she was about down sick.   On the 5th or 6th of May she told me she had deeded her property.   At the time I saw her, from the beginning of the prosecutions to the making of the deeds, she appeared very much excited, and her health seemed poor.   After she had signed the deeds he saw her weeping.   Is asked if he saw this before deeds signed ; says, I noticed she was in trouble, a good deal excited.   Always thought him to be a temperate man ; never knew him to be intoxicated but once or twice ; about seven years ago, at a party.   Castle is a man that gets excited in case of trouble ; he is easily excited.   Mrs. Castle, before the deeds were executed, told me E. H. Castle had attempted to kill himself by drugs ; expressed fears of his killing himself; that he was not in his right mind ; this was two or three days before ; might have been more.   About the first or middle of the week that I first heard Mrs. Castle had deeded away her property.

On his cross-examination he said :  E. H. Castle does not always keep liquor in his house.   I drank there on one of the occasions I have mentioned.   When his wife invited me to see him, German invited me to drink some prickly ash bitters that he had then.   Castle did not drink ; he was not there.   Knew Mrs. Castle three years before she was married.   She lived at Racine part of the time, Wheeling and Chicago.   She had lived in this State two or three years.   She was hired girl to Mr. Castle when I first knew her.   I believe when she first came into the family she was fifteen years old ; after my acquaintance with her, I knew she worked as a hired girl, and mistress of the family after his wife died, till they were married ; she was a girl that Mr. Castle took when she was quite young, from thirteen to fifteen, and brought up.   I do not know what compensation she got.   I knew nothing only what she and Mr. Castle told me ; she told me, and Mr. Castle told me the same, when I first came to this State.   When I first knew complainant, was

a transient man in Buffalo and Cincinnati ; since then in Wheeling, Chicago and vicinity. Farming and milk business. To work for myself; farmed on land of James Parker. About three miles from E. H. Castle.

The next witness in order was *Dr. Joseph W. Freer*, going principally to the apparent condition of mind of E. H. Castle —his laboring under a " spiritual delusion "— " great nervous excitement, reacting on his physical condition to the extent of loss of appetite, sleeplessness," etc. Had been their family physician since July, 1848. Mrs. Castle, at the time of the arrest, was in the family way, with some unusual symptoms attending it. Her fears were greatly excited by Castle's condition and prosecution; she supposed it was a case involving imprisonment. I do n't know that it had any effect on her peculiar condition. She seemed, while the prosecutions were pending, to be in a constant state of anxiety, more in reference to the criminal prosecution than otherwise. Her condition of pregnancy was calculated to augment her mental anxiety. Women in that condition are more excitable than in ordinary health, and give way to fears more rapidly. Called at Castle's to visit a child who was supposed to have inserted a needle in her abdomen. Think it was in 1856, after the arrest.

On being cross-examined he said : Mrs. Castle was confined in the winter; December or January. These dates can be fixed by my books. Talked with Mrs. Castle before these arrests, about the liability of her husband to become insane. Castle lived on a farm about twenty miles north-west from Chicago, in July, 1848. At the time of the improvement, in answer to fifteen, he did not seem to dwell as much upon the spiritual delusions as formerly, although he did not give it up. How long before his arrest did you visit him professionally ? I visited him in 1848. How long before his arrest did you visit him professionally, for what, if any complaints, physical or mental, he was then afflicted with ? I cannot give the dates ; I have been in the habit of visiting him frequently for imaginary diffi culties ; I do n't know that I ever gave him a potion of medicine previous to his arrest, except in 1848. I think I was never called there on purpose to be consulted in reference to these spiritual delusions. *1 think Mrs. Castle evinced no more anxiety than a wife would who loves her husband as she seems to.* I think she first suggested to me the danger of his doing injury to himself. Nothing was said about injury to others.

I do n't recollect any facts or particular circumstances stated as suggesting such apprehension, further than his manner or conversation. I did not mean that Castle's improvement, four weeks after the arrest, was solely from his spiritual delusion.

He then began to feel, apparently, that his prospects were brighter. He had also improved in his physical health. His physical health was affected to the degree of loss of appetite, feeble pulse, furred tongue. My recollection is that his worst condition was about a week or ten days from the time of his arrest. I did not consider it a serious ailment, but a very great disturbance of the nervous system. I do not usually call a disturbance of the nervous system a physical ailment; those are usually of the organic or nutritive system. The degree of nervous derangement was very great in this case; as much, apparently, as his mind could possibly bear. The danger, in such cases, is that of insanity.

This nervous derangement did not continue after the arrest in same degree, until improvement commenced. It began to decline in about ten days. He remained confined in the house for four days of these ten. For four consecutive days. Were the first part of the ten days. I know he was confined, by finding him in his bed when I called to see him. I called during those four days every day; sometimes twice. Sometimes in the morning, and sometimes in the afternoon. He was not confined by my directions. I considered it a matter of necessity with him that he should so confine himself. I did not direct him to confine himself, because I do n't know that he requested permission to go out. Thinks there was a time when he could not have gone out, had he been so disposed. Does not know of his his being confined to the house after these four days expired.

I have examined my books, and find the date of Mrs. Castle's confinement to be Nov. 10, 1856.

This witness desired to correct his deposition as follows:

I find, on examining my account books, that Mr. E. H. Castle's illness did not commence immediately after his arrest, but that my first professional visit for E. H. Castle was May 15th, 1855, *and the four days of consecutive illness were from May* 21 *to May* 24, 1856; although I was in the habit of visiting him frequently, from the time of his arrest to the time of his illness.

The next witness is *Charles R. Parks*, who deposed that his age was thirty-eight; residence, Panola. Known Emeline Castle for three years. In April and May, 1856, was baggage master on the G. & C. U. R. R. and Ill. Central R. R., from Chicago to Dunleith. Was in Chicago three nights in the week —Monday, Wednesday and Friday; left the following mornings; came in 4 to 6 P. M.; left 9 A. M.; stopped at E. H. Castle's house. While there heard about trust deeds by Mrs. Castle, to secure debts of E. S. Castle. Her health was poorly; think she was pregnant about that time. Heard Mrs. Castle say that she should have to sign some trust deeds, in order to

save E. H. Castle from the penitentiary; that she was afraid that unless she did sign them, they would send him to the State prison, for it seemed that the whole city was down on them; she often said to me she did not know whether to sign them or not; asked me what I thought the result would be if she did not sign them. She expressed herself that she was afraid if she did not sign them, that he, E. H. Castle, would make way with himself or her; on one occasion, as I was passing through the hall, going up stairs, the room door leading into Mr. and Mrs. Castle's room was partly open; I heard her call, and heard some boisterous talk in the room; I then stepped in, and he, E. H. Castle, had hold of her, Mrs. Castle, and said that she must sign those deeds; I then took hold of him and asked him what he was doing; I cannot give the reply that he made; he then stepped out of the room; I asked her what the difficulty was; she said he was at her to sign those deeds, and threatening her; she was afraid she would have to sign them, or he would commit suicide or injure her; during the time these things were pending she grew poor, and looked as if she had had a fit of sickness; I could see a difference in her from time to time, as I went there. This difficulty in the bedroom occurred same week the deeds were signed. I considered him insane during the time the deeds were talked about being signed; Mrs. Castle asked me to watch him, for fear he would make way with himself; he talked at random. I have known E. H. Castle twenty-five years. Heard a good deal said in the family about the assault on German; Mrs. Castle said she thought they mistook him for her husband.

The next is *Peter H. Webster*, who deposed that his age was thirty-seven; residence, Loda, Ill. Known Mrs. Castle and Filkins two years, E. H. Castle twenty. On the 3rd of May resided at Mr. Castle's; was a clerk in his employ; was there about two weeks before and after that date. His family then resided about a mile west of Union Park, in Chicago. Was at that time familiar with Mrs. Castle; her health, so far as I know, was poor; she was complaining before this trouble came on, and when it came it seemed to overcome her, and excite her very much. Castle's health good before this trouble, but it seemed to strike him down at one blow; he was very much excited, and appeared to me deranged; he cried, and talked everything that was unreasonable, and wished himself dead, and threatened to kill himself; I was afraid he would, unless he was watched; Mrs. Castle also was afraid; wanted I should watch him. I overheard some of their conversation while they were going to bed in their sleeping room; I was in the parlor; about her signing those deeds; heard him threaten either to

kill himself or to kill her, unless the deeds were signed; do n't know to which of them the threat referred; he was in his room a portion of the time, in a raving condition, walking the room, wringing his hands, and wishing himself dead. He walked the room, etc., in presence of Mrs. Castle.

The trouble alluded to in the 5th answer was brought on by Mrs. Castle's signing away her property, to prevent Castle's insanity and going to the penitentiary; he knows by their actions and what other people told him. Before the deeds were signed, I saw Mr. and Mrs. Castle sitting on the sofa, both crying and sobbing; Mrs. Castle said something about their having to sign away their home in such a way. The conversation in the 5th answer, stated to have occurred in the bedroom, was before the deeds were signed. Mrs. Castle's child had been unwell before this, and she had been up nights, broke of her rest.

On his cross-examination he said, he was a cousin of E. H. Castle. Not interested in event of suit. Had a conversation with E. H. Castle last winter; asked him how he got along with his suit; told me that the prospect was rather favorable. Was in E. H. Castle's employ part of the time I was in Chicago, acting as his clerk. Left his employ about two weeks after the deed was signed. Do n't know how long Mrs. Castle had lived with E. H. before their marriage; understood from their friends that he had brought her up from a small girl. Heard threat in bedroom distinct; could not have been mistaken as to its import. The door of the room was closed; can't say whether it was latched; was in the adjoining room. Their conversation was not very loud.

The next is *Mary A. Webster*, who deposed that she was 23 years of age; lives at Loda, Ill. Known complainants, Filkins and E. H. Castle, about two years. On 3rd May, resided on Lake street, one mile west of Union Park. Resided there from 22nd Dec., 1855, to August, 1856. Mrs. Castle lived one-fourth of a mile from witness. Complainant was often at my house and I at hers; intimate with her. We were neighborly; strong friendship between us; on intimate terms as a neighbor. We were on intimate terms; she confided in me, and told me her sorrows. Was at Mrs. C.'s house 3rd May, 1856. Went there at 10 A. M.; several gentlemen came into the house to transact business with Mrs. C.; strangers to me; Mrs. C. came down to the kitchen in tears. Prior to Dec., 1855, lived with Mrs. C. six weeks. Did not have any conversation that day with Mrs. C. when she came into the kitchen, in tears. Mrs. C. was in feeble health on that day, in consequence, as she said, of having passed sleepless nights; she was very much excited. Her mind was in a state of great excitement, apparently. The causes of that excitement

17

were her husband's arrest; her being obliged to sign that deed, those writings to save her husband from the penitentiary, which would deprive her and her children of a home; also to prevent her husband from insanity.   The writings she refers to was the signing a deed to convey property to other persons unknown to witness.   Thinks it was signed May 3rd, 1856.   Had conversation with Mrs. C. several times on subject of Mr. C.'s arrest, and the conveying property by Mrs. C. to other persons; cannot remember the particular day before and after the signing of the deed; at one time she said he was partially insane; that their physician had ordered her to watch him; at another time that he ordered her to prepare to go to St. Louis on morning train; got ready and woke him, and told him time to be getting ready; he asked, getting ready for what? she replied that he told her to get ready for St. Louis; his reply was, he had never thought of such a thing; wondered what had put that in her head; by that she knew he was partially insane; at another time that nothing would save him from the penitentiary but her signing that property to those men; at another time that she felt it very unjust that she should be compelled to sign that deed, because it was to pay some one else's debt, not of their own contracting; other conversations on that subject amounted to about the same thing.   Was acquainted with the condition of E. H. Castle's mind and health during those times, and before deeds signed; at times he appeared very singularly; have been there when he would lock himself in his room, pacing the floor, crying and moaning; would not allow the family, not even his wife, to come into his room; at other times he appeared melancholy; said he should die on 18th June.   Never heard any conversation between Mr. and Mrs. Castle on the subject of Castle's arrest, or on the subject of signing the deeds.   Has stated as far as she can, all that occurred at Castle's house on the 3rd May, 1856.

On her cross-examination, she said she was friendly to Mrs. Castle.   Testifies at request of Mrs. C.   Her husband and E. H. C. are cousins.   Has resided in Illinois two years.   Came the 18th Nov.; recollection good of dates.   Has had no conversation with any one about the matter since she left Chicago, except that morning with Castle.   Remembers that she was at Mrs. C.'s on the 3rd May, because she knows that it was that day those documents were signed; it was impressed upon her mind from the fact that Mrs. C. said that it was an era in her life, as she had signed away her property on that day, and deprived herself of a home.   She objected to signing the deed because she said she thought it unjust to pay the debts of others, and not of their own contracting.   Knows Castle kept liquor in

the house, and sometimes drank it; never saw him intoxicated. Left the room immediately after she found they were talking. Saw him about ten minutes before this conversation. In the sitting room; conversed with him then fifteen minutes about the business of the store. Castle first showed signs of mental derangement when it was said his wife had got to sign away her property. Thinks it was before the threats alluded to in the 5th interrogatory. Castle never offered violence to his wife, to her knowledge.

The next is *Alfred German*, who deposes that he has known complainants, E. H. Castle and Filkins, about three years. On 3rd May, 1856, was living at E. H. Castle's house. Was about the house, and thinks he went into the kitchen when Filkins, Davis, Farnsworth and Wilkinson came to the house. As I passed into the dining room, I met Mrs. Castle, crying, and Mr. Castle came into the room immediately afterwards; he requested her to go up stairs to sign the deeds; she at first refused; did not want to sign away her homestead and property, or something to that effect; Castle said she must go up and sign the deeds or sign his death-warrant, or words to that effect; she said she would as soon sign her own as his, and consented at length, and went out into the hall with Castle, and went up stairs, This was in the dining-room. After the arrival of Farnsworth and Wilkinson; they were up in the parlor at the time. Castle was very much excited; talked violently; expressed great anxiety and uneasiness about his difficulties, and the influence this event would have upon them; his manner was threatening. Mrs. Castle was excited; seemed overcome with sorrow, crying bitterly, and seemed to be greatly moved and influenced by the difficulties that surrounded her husband. At that time Mrs. Castle asked me about her signing the deeds; at first advised her not, *and then advised her to do so;* Mr. Castle joining in the conversation; she said if she did not, Castle would make way with himself; she talked some time. The subject was often the topic of conversation between Castle and his wife for several days before the deeds were signed; he was constantly urging and threatening her, trying to induce her to sign the deeds; told her, in substance, that he was a ruined man, and the only way to settle the prosecutions that were hanging over him, was for her to sign the deeds; he was very low spirited and dejected; she all the time expressed her unwillingness to sign the deeds. Witness knew of prosecutions; Mrs. Castle must have known of them, for there was hardly anything else thought of or talked about in the family for several days before the deeds were signed. For a few days next and before deeds were signed, Castle acted more like a crazy man than anything else.

While these prosecutions were pending, he sometimes threatened to kill himself; once, when crossing Lake street bridge with witness, attempted to jump into the river; other things, witness don't recollect, showing a wild, excited state of mind. She was fearful he might kill himself or her. Witness watched Castle, to prevent his putting his threats to kill himself into execution, by the advice of Dr. Freer and at request of Mrs. Castle. The Daily Democrat and Times were in the house every day; cannot state whether she read them or not. There were articles in the newspapers about these prosecutions; don't know whether Mrs. Castle read them or not. About the time Castle was arrested, witness was attacked and beaten; had on Castle's overcoat; was driving his horse and buggy; as soon as he began to cry out, they left him. Told Mrs. Castle of it; she said she thought they had intended to kill him for her husband.

On his cross-examination, he said he had known E. H. Castle three years; kept a land office, 100 Randolph street, during that time. Was not present at the making of any deeds of which the acknowledgment was taken by Davis. Does not know that Mrs. Castle read the papers. A watch was kept on Castle both before and after Freer began to visit him, in May, 1856.

The next is *Elizabeth German*, who deposed that she has known Mrs. Castle from childhood; Castle about five years; Filkins about two years. Is Mrs. Castle's sister. On 3rd of May, 1856, was living with complainant. Received Farnsworth and Wilkinson when they came there that day. When they came, she was in the basement, in the dining room. She said they had come to get her to sign some deeds. Was in the family of Mr. Castle for a few days before deeds were signed, and the prosecutions were frequently the subject of conversation. During the few days next before the trust deeds were signed; heard a great deal said on that subject; heard Mrs. Castle and her husband talk about it; it was the leading topic of conversation; don't know how often it was talked about. Castle said to Mrs. Castle, that if she did not sign those deeds he would make way with himself; at other times that he would desert her, and break up the family; this is the substance of what he said; talked everything he could to frighten her to signing the deeds; Mrs. Castle often said she did not want to sign them, but considering the situation Castle was in, she did not know but she should have to. Castle was greatly excited and confused when speaking with Mrs. Castle about the deeds. For a few days before signing the deeds, Castle was laboring under great anxiety of mind, generally desponding, talking in an excited and reckless manner. Mrs. Castle said

she was afraid he would kill himself or her, as he had threatened to. Mrs. Castle's health was in a very critical condition at that time, and had been for some time before; she was about to be confined; her limbs were very much swollen, and she moved about with difficulty; she was confined to her own room much of the time, and neither ate nor slept with any regularity. Filkins was in the house two or three times a day for several days before signing the bonds; his wife was also there, and talked with Mrs. Castle on the subject. Did not hear any conversation between Filkins and Mrs. Castle; they were in her room several times. That was within a few days before the deeds were signed. Filkins usually talked quietly and privately to Mrs. Castle; Castle's arguments were numerous and varied; sometimes used mild terms, and at others threatened her; he told her in substance, that unless she did sign the deeds he would be sent to prison, and rather than be sent there he would kill himself; said a good many other things similar in tone. Witness resided with her parents, in New York State, when complainant first came West. Saw her at the time she started.

On her cross-examination, she said:

Mrs. Castle was not in the parlor when Farnsworth and Wilkinson came; went down stairs to her soon, and was in and out while business was going on. At the time of the conversation alluded to in answer to 6th interrogatory, Mrs. Castle and witness were in basement, and Farnsworth and Wilkinson in the parlor. Mrs. Castle talked with Miss Morrill, her husband, and other members of the family, about signing the deeds. Did not hear or see anything about other deeds to be executed by Mrs. Castle, to relieve her husband, about same time. Supposed the money complainant had when she came West, she had saved from her earnings when at service. Only knows she had money from information and belief. Witness lived with her father at that time. Since she was a child. Had not laid up any money. Mrs. Castle was not taken by Castle to bring up; but worked in his family at different times before his first wife died; think it was about eight or ten years ago; when she first went to live with him, they lived in Pennsylvania, and afterward in Illinois. Don't know what compensation she received; don't know how long she worked for him; was at different times in Pennsylvania and Illinois before his first wife died. Names other places where she had lived at service; cannot give the compensation she received. She went to service at about twelve or thirteen years of age. Cannot tell how much it costs a year for a girl to dress and clothe herself. Has resided in Binghampton since complainant came West, until came to Illinois. Was married after Mrs. Castle, and before witness came West, to her pre-

sent husband, Alfred German. Witness, aged 30; complainant's, 36. Dr. Freer was in attendance upon E. H. Castle part of the time when the conversations occurred, which witness relates in answer to direct interrogatories. Did not see her very often before she came West; did not know, of her own knowledge, that she had money; family generally understood she was laying up money; never saw money in her possession; she said she had money, and other members of the family said she had. Was not present when Mrs. C. signed the deeds. Has made an affidavit to be used in this cause about a year ago. Has not seen it since she swore to it. Nor any copy of it. Had not heard or read the interrogatories until propounded to her. The affidavit was drawn beforehand, and then signed and sworn to by me.

This is all the testimony going to establish fraud, duress, undue influence or coercion over the complainant, and is made up of her own declarations, detailed by her relatives and familiars sympathizing with her, and disposed to magnify small circumstances into great matters, but which really does not show the least particle of such coercion as is contemplated in the law, as sufficient to destroy a deed well executed and acknowledged on its face.

Opposed to these trivial matters thus deposed to, is the testimony of Davis, the notary, of Wilkinson, and Farnsworth, the subscribing witnesses, and the attorneys of the creditors, who visited the complainant for the express purpose of seeing that everything was fairly and legally done.

The testimony of Davis has been given. That of Wilkinson is as follows:

*Lorenzo D. Wilkinson* deposed that he has known the complainant about a year and a half. Known E. H. Castle and Filkins about two years. Is one of the subscribing witnesses to the trust deeds. Exhibits 1 and 2. (Deeds in controversy.) Was present when it was signed, with Davis and Farnsworth. The deeds were executed on the 2nd or 3rd of May, 1856; myself and Farnsworth took a hack and went out to Castle's house, about 12 o'clock in the day; the deeds and notes had previously been prepared at the office of Farnsworth & Burgess, and Castle and Filkins agreed to get Wm. H. Davis, who was a notary public, and meet us at Castle's house, to have the deeds executed; Farnsworth and myself arrived there before Filkins, Castle and Davis; from a half to three-quarters of an hour; thinks Mrs. Castle opened the door to let us in, but it might have been some one else; we took seats in the parlor, with Mrs. Castle, and immediately I informed her of the object of our visit; she remarked in reply that she knew what we came for,

that she and her husband had talked it all over together, and that she perfectly understood it; we then conversed with her upon this matter most of the time, until Filkins, Castle and Davis arrived, and I found from her conversation that she perfectly understood the facts connected with the business we had called upon, and the effect of the papers to be executed by her; in the course of the conversation, and before the arrival of Filkins, Castle and Davis, she stated, either voluntarily or in answer to myself or Mr. Farnsworth, that *she should execute the papers freely and voluntarily,* and I recollect that she used the expression, *that it would be one of the most cheerful acts of her life;* during this interview, and before the arrival of Castle, Filkins and Davis, Mr. Farnsworth and myself explained to her the legal effect of the papers which were to be executed; after Mr. Davis arrived, he explained to all the parties the papers, and they were executed by Mr. Castle and Mr. Filkins on their part; Mr. Castle and Mr. Filkins then went into another room, at the suggestion of myself, Mr. Farnsworth and Mr. Davis; Mr. Davis then sat down by the side of Mrs. Castle, and in the presence and hearing of myself and Mr. Farnsworth, carefully explained to her the papers which she was to execute, and the legal effect of the same; when he had fully explained the same all through to her, he then distinctly asked her whether she should execute those papers freely on her part, and without any compulsion on the part of her husband; she stated in reply that she understood the matter before just as he had explained it to her; that she had had several days to think of it, and had thought the matter carefully all over; that her husband had used no compulsion, nor compelled her in any way to sign them; that she was perfectly willing to execute the papers, and should do so willingly; and thereupon she then executed the papers on her part; I am not certain that Filkins executed the papers, as trustee of Mrs. Castle, before or after they were executed by her; my best recollection now is that he signed subsequently to Mrs. Castle; Mr. Farnsworth and myself then signed the papers, as witnesses to the execution; I don't know whether Davis signed as a witness or not; on referring to the deeds I see he did not; the deeds were then delivered to Mr. Davis, to take to his office and affix his notarial seal, as he had no such seal with him.

I will not undertake to give you the exact language; from my best recollection, I stated to Mrs. Castle, in regard to the object of our visit, that we had called there to settle up the matters upon which her husband and others had been prosecuted; I think she then replied, in substance, that she knew the object of our visit, *that she and her husband had talked and considered the matter all over,* that she was expecting him in immediately;

one or both of us explained to her that her husband had agreed to settle certain debts or claims growing out of the transactions of her husband and E. S. Castle with other parties; we referred to the fact that it was understood her property was to be given as security for the settlement and adjustment of those claims; I now recollect of stating to her myself, that it might be a hard case for her, that it was a matter she ought well to consider, and not to proceed in too hastily, and stating in connection with these remarks, as a reason, that if her husband did not take up the claims when due, that her property would have to be sold, and perhaps sacrificed, to pay them; her reply to that, as near as I can recollect, was in substance, *that she had well considered the matter, that she had thought it over, and talked it over with her husband;* and I think *she also said that she had conversed with Mr. Filkins about it, and that she fully understood the consequences;* I cannot now recollect whether Mr. Farnsworth made any different or other statements than what I made myself, but do recollect that he coincided with the explanation which I made, as stated above, and I think he made to her some of the same or nearly the same language which I have given above as my own.

On his cross-examination he said:

The parlor was situated on the northerly side of the house, next to Lake street. It was on the first or main floor. There is a basement story below that where the parlor is. The front room entered a hall. My best recollection is, that Mrs. Castle met us at the door, but not certain about it. A few minutes after we entered, the subject of the object of our visit was introduced. Do not recollect of any others but self, Farnsworth and Mrs. Castle being there during that few minutes. Does not recollect the weather, nor whether there was a fire in the room, and cannot give their precise location in the room. Did not notice whether there were any other persons in the room after our arrival and before that of Filkins, Davis and Castle. I think Mrs. Castle remained with us in the room nearly all that time; she might have gone out once or twice, but she soon returned. Much the larger part of the time before Davis came was occupied in the conversations I have detailed; some of it miscellaneous conversation. I have given as near as I can, the substance of the language used. The persons I spoke of to her as having been prosecuted, were Filkins, Barker, and, I think, Runyon, with Castle. We referred to one or more prosecutions in the name of the People of the State of Illinois, against the parties above referred to, based upon a conspiracy, together with one E. S. Castle, to obtain property under false pretenses, from sundry merchants and others, in the city of Chicago; as

Mrs. Castle appeared and stated that *she fully understood the whole matter in regard to the prosecutions,* we did not have occasion to be very specific or definite in our language in regard to the same, and therefore I cannot go into the exact language. The way that I knew she and I referred to the same prosecutions, was *from her familiarity with the facts and circumstances of the affair; she appeared to be so fully informed that a mere reference to the matter was sufficient to introduce it.* They were in the course of the conversation frequently spoken of as the E. S. Castle matters, or cases. I cannot now recollect whether she used any language from which I then inferred that she understood whether the prosecutions were then pending or not, but she did appear to understand that a settlement had been agreed upon between the creditors and the parties who had been prosecuted. I do not think that anything more was said at that time with regard to the prosecutions than a mere reference to them, for the purpose of bringing up the subject matter of the settlement and the securities, as that was the object of our visit. I endeavored, and I think Farnsworth did, to avoid any unpleasant language or reference to the matter in connection with her husband, beyond what was necessary for the object of our visit. By the word "matter," I partly mean the prosecutions, and also to include the claims of the creditors in connection with the same, and also the charge against her husband for obtaining, or assisting to obtain, the property for which the claims existed. I supposed, at that time, that if these deeds were executed, the private prosecutors would not, on their own account, further prosecute; though I do not know that any of them ever said so to me. I also supposed that if the settlement agreed upon was not perfected and carried out, the prosecutions would be pursued. The agreement for the settlement between the creditors and the defendant was not made with me personally, nor in my presence; but as I understood it, and as I think from some of both parties, the creditors were to receive judgment notes on time, signed by E. H. Castle, Joseph Filkins and Mrs. Castle, to be secured by trust deeds upon real estate, in consideration of which, the creditors were to give up the indebtedness, and evidence of the same, which they held against E. S. Castle, and on which they also claimed that E. H. Castle and Joseph Filkins were liable; and the defendants were to pay the costs up to the time of the settlement. I mean by the defendants, E. H. Castle and Joseph Filkins; I mean by the costs, the officers' expenses occurring to C. P. Bradley & Co.'s detective police, and also the costs in several civil suits commenced by several of the creditors, against some or all of the parties above referred to as defendants; whether the fees of the magistrate

and any witnesses, if any were summoned, were to be paid by the defendants or not, I do not know, as I heard no agreement of the kind, and do not know whether the same have been paid or not ; the defendants were also to pay the attorney's fees, but whether included in these notes he does not know ; some were, I think, and some not. These attorney's fees were for commencing suits, drawing affidavits, and also attendance on the criminal prosecutions ; they were rendered by myself, Farnsworth and Burgess, Waite, and John A. Thompson. The affidavits that I alluded to were for Bond, Benedict, Mallory & Farnam, Ideson, Jordon & Bellows, and Post & Thomson. When at Castle's house I was acting specially for Bond, Benedict, Mallory & Farnam, Ideson, Jordon & Bellows, and generally for several of the other creditors.

Mrs. Castle, at our interview with her, spoke of E. S. Castle. I cannot say what she did say about him ; he was spoken of in connection with the business. I think he was merely referred to in connection with the business. Mrs. Castle said *the execution of the deeds was one of the most cheerful acts of her life.* Don't recollect that she assigned any particular reason for it. I don't recollect that she on that occasion expressed herself in substance that she had felt much trouble about Mr. Castle's difficulties, and was glad to see an end of them ; but she might have said so. I don't recollect that she expressed herself as having had any personal trouble in regard to the matter in regard to her husband ; I think she spoke of it as a matter upon which he entertained no fear as to the result. If I had not been informed as I had in regard to the facts as they had been represented to me, it might have seemed strange that a woman would cheerfully consent to place her own property in such jeopardy, but under the circumstances under which I acted, it did not. The circumstances to which I refer, were not supposed by me, but was the result of information furnished me as an attorney, in my profession ; among which were the representations that all, or nearly all, of the property obtained of the creditors, to whom these securities were given, had passed through the agency of E. S. Castle into the hands and possession of the said E. H. Castle, and by him converted to his own use or turned into money and used in his business ; and from Mrs. Castle's familiarity with the whole transactions in general, I presumed that she was also knowing to this fact, and therefore supposed she considered it as a mere payment of a debt on the part of her husband, for the property he had received ; it had also been represented to me, but upon how good evidence I am unable to state, that the property given as security and described in the trust deeds was really and in equity the property of the said

E. H. Castle, and was kept in her name for the purpose of a cover; believing those representations, and not knowing the contrary, I was not surprised that Mrs. Castle should do as she did do. I can hardly tell what my suppositions then were, as to whether the stopping of the criminal prosecutions had quite as much to do in prompting the execution of the deeds as any thing else; I probably supposed it might form some part of her motive; but as she never stated to me her motives, I am unable to represent them; I think during some part of the conversation she expressed herself to the effect that she hoped or trusted that her husband would be able to save himself from loss from the property of E. S. Castle, or in words or ideas to that effect. I think she said that E. S. Castle was not an honest man, or had not dealt honestly with her husband, and that he had lost in business by trying to help E. S. C. I think she intimated no other property of E. S. Castle except that obtained from the creditors; she might have alluded to other interests of his. I am very positive that the property obtained from the creditors, for which the securities were given, was referred to by her, but the precise language I cannot state. I had seen Mrs. Castle once before, when I called there about renting a house. It was in March, 1856. The house I proposed renting then was occupied; cannot say by whom. Don't know what time of day I called. Neither dined or took tea there. Mrs. Castle was present part or all the time I was there; there was a small child there, and Mrs. Castle explained to me that it had got a needle in the fleshy part of the abdomen; should think I was there from half to an hour. Has seen Mrs. Castle since deeds were executed, but has not spoken to her. Cannot tell how often, several times. Cannot tell where, but in the street. Describes Mrs. Castle's appearance. Has no interest in the suit.

Have no doubt about the fact that the person with whom I conversed before Davis, etc., came there, was the wife of E. H. Castle, and signed the deeds. I remained in the house on that occasion; I cannot state the precise time after the deeds were executed, but, about half an hour. Castle, his wife, Filkins, Davis, and Farnsworth, remained with me. I don't recollect any others. Immediately after the execution of the deeds, I or Farnsworth spoke of returning. Castle then remarked, in substance, that as we had come to his house and treated him like gentlemen, he wished to do the same by us, and I think he remarked to the effect that he always had something good for his friends in his house. Mr. and Mrs. C. then went into an adjoining room together; my best recollection is, she went in alone, and we followed at his invitation. A bottle of brandy was placed on the table, and we all partook of it. We then

had some general conversation, in which I think Mrs. Castle participated. We then took another glass, and left. When the deeds were fully executed, from my best recollection, E. H. C. manifested some undue excitement. I spoke to him myself, in substance, that having undertaken to execute the settlement that day, and having closed the settlement while calm, he ought not then to undertake to throw any doubts or difficulties over it by any such state of excitement; that it would be all nonsense on his part to try to make us believe that he was as excited as he attempted to appear. Farnsworth also spoke to him, but what he said I did not hear. Davis also spoke to him; immediately upon that, Castle became calm, and gave as an excuse in explanation of his excitement, that he had done a great deal to assist E. S. Castle in business, and that he had proved unfaithful to him, or language to that effect. Before we left, the deeds were delivered to Davis, to affix his notarial seal, and deliver to us for the creditors.

Don't recollect whether I conversed with any other woman but Mrs. Castle. Thinks she remained with them until they left; she might not have done so. The time we were there after deeds signed about the same as that before.

*John F. Farnsworth* deposed that he knew the complainant; first became acquainted with her the fore part of May, A. D. 1856; that is all the acquaintance I had with her. I have been attorney and soliciter for a number of the defendants in this suit, but am not now. I do know the facts about the execution of the trust deeds which are in controversy in this suit; the deeds were executed by E. H. Castle, Emeline Castle, his wife, and Joseph Filkins, the trustee of Emeline Castle; the deeds were executed the 2nd or 3rd of May, 1856; L. D. Wilkinson, Esq., W. H. Davis, Esq., and myself, were present at the execution of the deeds. L. D. Wilkinson and myself were the subscribing witnesses. The several parties to whom the notes in the trust deed described were made payable, held demands against E. S. Castle, to the amount of the said several notes, for goods sold to him, said E. S. Castle, and they claimed that the goods were sold upon the recommendation of E. H. Castle, Joseph Filkins, and one John D. Park; I think others connected with them; and that E. H. Castle and Filkins had received the benefit of the said goods; had taken possession in one way and another of all the property of E. S. Castle, and got him to run away, for the purpose of cheating these creditors; that the recommendation by Filkins of E. H. Castle to credit, was contrived and planned falsely, to cheat and to defraud the said several creditors. Most of the demands so held against E. S. Castle were in promissory notes; some few were in accounts, and some in

judgment; some of them (Turrell & Haven, for instance,) were secured, as they claimed, by levy upon property; some of those creditors had commenced prosecutions against Filkins and E. H. Castle, and the others, for the offense above mentioned, and some of them had commenced civil suits against them, " on the case," to recover their damages; thereupon E. H. Castle proposed to settle, and secure the said several demands of said creditors, by giving his notes for the amounts, to be secured by trust deeds upon real estate, provided *all* of the creditors would come into the arrangement, and pass their several demands against E. S. Castle over to him, so that he might have the benefit of them; this was finally agreed to by all the creditors or their attorneys; some of the creditors of E. S. Castle being sent for, at the solicitation of Mr. E. H. Castle, and persuaded to go into the arrangement; this was a day or two prior to the execution of the deeds; I was acting as one of the attorneys for most of the creditors; as Mr. Castle proposed to secure the demands upon two pieces of property, the amount of indebtedness was divided in accordance with the relative value of said pieces; notes were prepared at my office (after the several debts had been exhibited to Mr. E. H. Castle, at his office, and the amounts settled on); the deeds were also prepared at my office, in accordance with the agreement, to secure the notes; I took the notes to Mr. Castle's office, where he executed them, and it was agreed that he (Castle) and Filkins and Wm. H. Davis (then attorney and notary public) would meet Mr. Wilkinson and myself at Castle's house, at a particular hour, to execute and acknowledge the deeds; I thought it important to see that the deeds were fairly and properly executed, and that Mrs. Emeline Castle, the complainant, fully understood them and willingly executed them; this was the only reason why I went to the extraordinary trouble of being present to witness their execution; L. D. Wilkinson went with me, in a hack, to Castle's house, which was, I should think, a mile and a half from my office; we arrived there I should judge a half hour before Castle, Filkins and Davis came; on arriving, I think I inquired for Mrs. Castle; she either came to the door, or shortly came into the parlor where we were sitting; we told her that we came to meet Mr. Castle and the others there, and told her the purport of our visit; she said, either in so many words or in substance, *that she understood all about it, and was ready and willing to execute the deeds;* I cannot state all the conversation we had together; Mrs. Castle was not in the room all the time; when in the room she conversed cheerfully upon that and other topics; I think we had some conversation about some pictures which hung upon the walls of the room, but can-

not say what was said upon that subject; when Castle, Filkins and Davis came, the deeds were executed by E. H. and Emeline Castle, and by Joseph Filkins, trustee for Emeline Castle, in our presence; Mr. Davis also explained the meaning and effect of the deeds to Mrs. Emeline Castle, and asked her if she *freely and voluntarily executed the deeds, without compulsion, etc.*, and she replied *that she did;* Wilkinson and myself signed the deeds as witnesses; Mr. Davis took them to put his notarial seal on them, agreeing to bring them to my office afterwards, which he did; after the deeds were executed and acknowledgments taken, Castle invited Davis, Wilkinson, Filkins and myself into a private room, where he produced some excellent brandy and other spirits, and invited us to *taste,* which I think none of us refused to do; Filkins, Davis, Wilkinson and myself then left the house; Wilkinson and myself returned as we came; I saw no indication of *reluctance* on the part of Mrs. Castle to execute the deeds; *if there had been, they would not have been taken.* The consideration of the notes was the demands against E. S. Castle, as I have stated in my last answer; I know nothing further, unless it be that a portion of the notes against E. S. Castle were delivered to E. H. Castle, and the balance of them were left at my office to be delivered to him whenever he should call for the same, of which he was notified.

I submit, in view of this testimony, if these deeds can be set aside, the titles of the country are in the most imminent danger, and we may expect a flood of litigation growing out of the precedent, to deluge the land. There is a total absence of proof of knowledge on the part of the creditors, of any improper influence having been exerted upon the complainant, and they not being parties to it, if there were, they had a right to repose upon her acknowledgment before a proper officer, that the deeds were her free and voluntary act. She ought to be estopped from alleging the contrary. The parties have acted on her admission, and she should not be permitted now to deny it. The object of a private examination by the officer, and informing a wife of the contents of a deed, is to give her an opportunity to retract—to enable her to state the means used to procure her assent, and to deny her free volition and consent. There will be no safety in dealing with a married woman, if she be permitted to nullify the law respecting the acknowledgment of deeds, except in a clear case. It was her duty to speak out when the private examination was had. She was guilty of a fraud in not declaring that it was not her voluntary act, and she cannot be allowed to claim her coverture as an apology for her fraud, or offer that against the effect of her own acts. 1 Story's Eq. Jur., § 385.

I think there is no ground for alleging any undue means or

improper influence, to obtain the execution of these deeds. That they were made freely and with a full knowledge of all the circumstances and consequences likely to follow, can hardly be doubted.

Before leaving the case, I must say, I am well satisfied this property thus secured to the complainant, never was in equity her property. She was a cover merely to conceal it from the creditors of E. H. Castle, who is represented by the evidence as insolvent, a swindler, and driven to desperate expedients to raise money, and finding for his purposes a convenient tool in his relative, E. Smith Castle.

The facts show, that at the time the land and farm, now represented by the Park Avenue and Holstein property, covered by these deeds, was purchased of the United States by the complainant, she was a domestic in Castle's family, and he himself, insolvent, having made an assignment of his property to Arnold and Ogden, and trading in the name of his father under a power of attorney from him. She had been in his service from the age of twelve or fifteen, until her marriage with Castle, and, as the Rev. Mr. Manley, an intimate of the family, says, not at wages, as he supposed, but as a member of the family, receiving perhaps some compensation for her services— rather a friend of the family. It is barely possible she could have in her own right, in 1846, the amount of money—three hundred dollars—necessary to pay for two hundred and forty acres of land, and wild land as that was, is not such an investment as servant girls usually have at heart.

Robinson, one of complainant's principal witnesses, says, that in February, 1846, the complainant, then in the service of Castle, called him up stairs to count some money, telling him it was to enter some land; that she did not want Castle to know it, as she had no confidence in him; that he counted in gold three hundred dollars and over. This witness seems to be a reckless, roving character, without much sense, and less integrity, judging from the whole tenor of his evidence, and his statements do not tally with those of Mr. Comfort, another of complainant's witnesses, who, I judge, is an honest man. Comfort says, when he was on a visit at Castle's, in 1846, complainant was living there, when this conversation occurred : Castle called her his daughter, and said—" Mr. Comfort, will you wait on her to the Land Office ? she has a mind to enter her some land." I said something to her about it, and she said: " I want to make me a home; that she might live an old maid, and she wanted a place to live." Comfort says Castle fenced the land in 1846 or 1847, with a post and rail fence worth sixty-two and a half cents per rod, and plowed some of it. It was enclosed with the lands of

Thomas Whitlock, except the part cut off on the north-west side by the road. Castle built a house on the land, worth six hundred dollars, and a stable worth one hundred or one hundred and fifty dollars, in 1848; Castle lived in the house up to the time he went to California, in 1850 or 1851; thinks Castle first spoke to him about entering this land; Smith Castle (E. S.) lived on it one or two years.

These facts satisfy me, that the entry of the land by complainant, was with the money of E. H. Castle, and was for his use and benefit. He was then insolvent.

Reuben Taylor states, that in 1852, E. H. Castle first applied to him to purchase the Park Avenue property, and with whom the price was settled. Mrs. Castle's name was mentioned in connection with the purchase, at the time of making the agreement with E. H. Castle. He said his wife had property given to her by her father, and this money was the avails of it, and that Filkins was her trustee. Three hundred dollars was paid by W. H. Davis before the contract was signed, and that Castle was not present when the money was paid.

Cochrane says, he sold the buildings on the property to Filkins as trustee of complainant, and they were paid for in the rents of Mrs. Castle's farm, which Smith Castle was holding as tenant.

Her sister, Mrs. German, says, that all the money or property complainant possessed was what she saved from her earnings as a servant; believes she had six hundred dollars when she went West, though she never saw her have any money.

Compare this testimony of Mrs. German with the statement of Castle to Taylor, that her father had given her money, and it is easy to see that it was false, for who so likely to know such a fact as that as her sister, Mrs. German.

But the testimony of E. Smith Castle is full on this point. He was the instrument by which the frauds and villainies, concocted by E. H. Castle and Filkins, were perpetrated, and for which the property now in controversy was conveyed in trust. The record is full of them. On this point he says, he thinks in February, 1845, the lands were entered by E. H. Castle in the name of Emeline Bennett; both parties told him so; E. H. Castle had, a short time before this land was purchased, been in business in Chicago, and failed, and made an assignment to Arnold and Ogden for the benefit of his creditors; E. H. Castle furnished money to enter three other eighties in the name of a cousin of his, Thomas Whitlock, afterwards trustee for Emeline Bennett; witness went into possession of the land entered in E. Bennett's name, by arrangement with E. H. Castle; built a house and barn thereon, and put some stock on, for all which E. H. Castle furnished the money; about

two years afterwards settled with E. H. Castle, and he got a deed from Miss Bennett for sixty acres of the farm lying west of the McHenry county road, and Castle moved into the house and lived in it. · This witness details minutely all the villainies he committed at the instance and by the procurement of E. H. Castle and the trustee, Filkins, and is not contradicted or impeached by a single fact in the case.

This property was Castle's property all the time, and being so, there is no hardship in appropriating it to the payment of liabilities he had incurred, and no great generosity manifested by the complainant in surrendering it for a purpose so laudable. This fact may have been one of the motives for her good act, the beauty of which she has, however, destroyed by this attempt to recover it back, and upon pretenses which have no footing in honesty or truth.

I need not say I differ from my associates with great reluctance, and not without great respect for their opinions, but in the view I have taken of the case, I have the fullest confidence I am sustained by the facts, by reason, and by authority.